Argued and submitted May 12, 2005, affirmed January 25, petition for review
denied June 13, 2006 (341 Or 80)

Misa OLSEN,
Melanie Reese, and Denise Tomitz,
*Respondents,*

*v.*

DESCHUTES COUNTY,
a political subdivision,
*Appellant.*

00-CV-0624-MA; A123197

127 P3d 655

Mark P. Amberg argued the cause and filed the briefs for appellant.

Roxanne L. Farra argued the cause and filed the briefs for respondents.

Before Edmonds, Presiding Judge, and Wollheim* and Schuman, Judges.

SCHUMAN, J.

Edmonds, P. J., dissenting.

---

* Wollheim, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

Defendant Deschutes County appeals a judgment following a jury verdict in favor of plaintiffs Olsen, Tomitz, and Reese, three former employees of its Mental Health Department. The case presents several issues arising from facts incident to the termination of their employment: the relationship between statutes of limitation for different wrongful termination actions, the validity of defendant's claimed immunity under statutes establishing workers' compensation remedies as exclusive, exhaustion requirements, and the sufficiency of evidence to establish an assault. We affirm.

Plaintiffs worked at Park Place, a county respite care facility for the mentally ill. They cared for clients directly and assisted other mental health professionals. Plaintiffs alleged that their supervisor, Muir, inadequately supervised the facility by failing to provide safety precautions for dealing with HIV-infected and hepatitis-infected patients, failing to keep records of client medication, and, in violation of department policy, admitting and retaining aggressive clients, one of whom, G, burst into an office and bolted threateningly toward Olsen and another employee. Plaintiffs asserted that staff apprised Muir and Muir's supervisors of their concerns, but nobody adequately responded to them, and, under Muir's leadership, the work environment became combative and intolerable.

Plaintiff Tomitz was terminated after having several disagreements with Muir concerning safety issues, reporting those safety concerns to Muir's supervisors, requesting further training from the Mental Health Department, and submitting a grievance concerning an allegedly retaliatory performance evaluation. Olsen and Reese contend (and the jury agreed, and defendant does not contest on appeal) that they were constructively discharged after repeatedly requesting further health and safety measures, which, they assert, were never provided. Each plaintiff alleged that the working conditions caused them sleeplessness, anxiety, and emotional distress.

All three plaintiffs brought actions for negligence and common-law wrongful termination. Olsen and Tomitz also brought an action under ORS 659.035, part of the general unlawful employment practices law, for violation of ORS 659.510,[1] the public employee whistleblower law, and Olsen sued for assault, asserting that defendant was jointly or vicariously liable for G's outburst. The jury returned a verdict in favor of each plaintiff on each claim with the exception of Olsen's whistleblower claim. Defendant appeals from the subsequently entered judgment, assigning error to the trial court's denial of several motions, each of which is described below.

In its first assignment of error, defendant contends that, because the pleadings on their face showed that the action was not timely filed, the trial court should have granted defendant's motion to dismiss Tomitz's whistleblower claim. ORCP 21 A(9). According to defendant, Tomitz brought her claim under ORS 659.510, the public employee whistleblower law, which states, in part:

"(1)   * * * [N]o public employer shall:

"* * * * *

"(b)   Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A)   A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;

"(B)   Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision[.]"

---

[1] Unless otherwise indicated, all statutory references are to the 1999 versions, which govern this litigation. As noted below, many of the key statutory provisions involved in this litigation have been repealed or amended.

As more fully explained below, ORS 659.035 prohibits *all* employers from, among other things, retaliating against employees who report certain violations. Among the retaliatory actions that are prohibited by ORS 659.035 are violations of the "whistleblower statute," ORS 659.510 to 659.535. ORS 659.035(1)(b). That statute prohibits, retaliatory action by *public* employers against employees who disclose, among other things, evidence of mismanagement and gross waste of funds.

It follows, according to defendant, that the statute authorizing civil remedies for violation of ORS 659.510 establishes the operative limitations on Tomitz's claim. That statute is ORS 659.530, and it states, in part:

> "[A]n employee alleging a violation of ORS 659.510 may bring a civil action for appropriate injunctive relief or damages, or both, within 90 days after the occurrence of the alleged violation."

Thus, defendant contends, Tomitz had to bring her whistleblower action "within 90 days" after "the alleged violation," that is, of her termination in retaliation for complaints concerning safety practices at Park Place. Tomitz was terminated on August 7, 2000, and her complaint was filed in December 2000, exceeding the purported 90-day limitation.

Tomitz, for her part, contends that her claim was brought not under the whistleblower statute, but under the more general unlawful employment practices statute, ORS 659.035. That statute specifies that violation of ORS 659.510, the whistleblower statute, is one among a variety of prohibited "unlawful employment practice[s]," violation of which "subjects the violator to the same civil and criminal remedies and penalties as provided in * * * [ORS] 659.121 * * *." ORS 659.035(2). ORS 659.121(3), in turn, with an exception not relevant to this case, establishes a *one-year* statute of limitation. Tomitz filed her claim within that one-year period.[2]

Tomitz, in other words, argues that her whistleblower claim was brought under the general unlawful employment practices statute and that statute's one-year limitation applies, while defendant argues that Tomitz's action was brought directly under the whistleblower statute and *that* statute's 90-day limitation period applies.

Resolution of this dispute requires us to construe the amended complaint. In doing so, "it is necessary to view each pleading as a whole, and not to isolate any single allegation as determinative of the nature of the suit." *Grider v.*

---

[2] In 2001, the Legislative Assembly amended the whistleblower statute by deleting the 90-day statute of limitation and replacing it with a one-year statute instead. Or Laws 2001, ch 621, §§ 2, 45. The new provision is not retroactive and does not apply to this case.

*Turnbow*, 162 Or 622, 632, 94 P2d 285 (1939). " 'Where it is doubtful upon what theory the pleading is drawn, it should be construed according to that theory which is most consistent with the facts alleged, and allegations not in harmony therewith may be considered as surplusage.' " *Lawrence Whse., Inc. v. Best Lbr. Co., Inc.*, 202 Or 77, 84, 271 P2d 661 (1954) (quoting *Lytle v. Payette-Oregon Irr. Dist.*, 175 Or 276, 293, 152 P2d 934 (1944)). The court should allow "reasonable latitude" in construing the pleadings "in order to reach a decision on the merits if it is reasonably possible to do [so] without prejudice to the substantive rights of either party." *Gaswint v. Amigo Motor Homes*, 265 Or 248, 256, 509 P2d 19 (1973).

The disputed claim is plaintiffs' First Claim for Relief.[3] Its caption declares it to be a claim for "[v]iolation of ORS 659.510, 659.035, and 659.530 * * *." Plaintiffs' citation to ORS 659.510 and ORS 659.035 supports the contention that, although violation of ORS 659.510 provided the *basis* for the first claim for relief, the *vehicle* for their relief was ORS 659.035, which lists, as an unlawful employment practice, "violat[ion of] ORS 659.510." Had plaintiffs simply asserted a claim under the whistleblower law itself, they would not have cited ORS 659.035 at all. The specifications within the First Claim for Relief and plaintiffs' prayer further support Tomitz's argument. Plaintiffs explicitly characterized defendant's actions as "unlawful employment practice[s]," using terms that are contained in ORS 659.035 but not ORS 659.510 or ORS 659.530.

Viewing the complaint as a whole, then, we conclude that Tomitz alleged that defendant violated the unlawful employment practices statute, ORS 659.035, in one of the ways specified in that statute, that is, by violating ORS 659.510. The plain meaning of ORS 659.035 cannot support defendant's theory that, as a matter of statutory construction, when violation of ORS 659.510 serves as a basis for relief for ORS 659.035, the claim is governed by the 90-day statute of limitation in ORS 659.530. In declaring that it is an

---

[3] Although both Tomitz and Olsen asserted the first claim for relief, Olsen did not prevail; only Tomitz's claim is at issue on appeal.

unlawful employment practice for a "public employer to *violate* ORS 659.510," ORS 659.035(1)(b) simply specifies that a whistleblower violation is one form of prohibited conduct. It does not incorporate a separate statute of limitation for a claim based on violation of ORS 659.510 but brought under ORS 659.035.

■     We are not persuaded by defendant's argument that the 90-day period must apply because it appears in a statute that is later and more specific than the statute in which the one-year limitation appears. The "later and more specific" maxim applies when statutes conflict. ORS 174.020(2). Applying the maxim necessarily renders one of the statutes—the older and more general—meaningless, and should therefore be used only when a conflict actually exists and cannot be avoided. *Cadle Co. II v. Schellman*, 126 Or App 372, 378, 868 P2d 773 (1994) (statutes on same subject should be interpreted so as to give effect to all). Here, the 90-day limitation under the whistleblower statute and the one-year limitation under the unlawful employment practices statute do not, in fact, conflict. As we interpret them, the 90-day limitation in ORS 659.530 applies to actions brought solely under that statute; when, as here, the action is brought under ORS 659.035, then the limitation period within that statute applies.

■     In sum, the one-year statute of limitation of ORS 659.121(3) governs. Under that statute, the limitation period runs from the time of the alleged violation. Tomitz's claim was brought within one year of her termination, and so the trial court did not err in denying defendant's motion to dismiss.

■     In its second assignment of error, defendant asserts that the trial court should have allowed the motion to dismiss plaintiffs' common-law wrongful termination claims because they are precluded by the availability of an adequate statutory remedy. Defendant does not maintain, nor could it, that terminating an employee as retaliation for reporting safety violations is not an unlawful practice. *Walsh v. Consolidated Freightways*, 278 Or 347, 351, 563 P2d 1205 (1977) ("[E]mployers should not be allowed to discharge employees solely for complaining about safety problems."). Rather,

defendant bases its argument on the well-settled principle that wrongful termination serves as "an interstitial tort, designed to fill a remedial gap where a discharge in violation of public policy would be left unvindicated." *Dunwoody v. Handskill Corp.*, 185 Or App 605, 612, 60 P3d 1135 (2003). Thus, recourse to wrongful termination is available only in the absence of a remedy "adequate to protect both the interests of society * * * and the interests of employees * * *." *Brown v. Transcon Lines*, 284 Or 597, 612-13, 588 P2d 1087 (1978) (quoting *Walsh*, 278 Or at 352) (first omission in *Walsh*). Whether an existing statutory remedy is adequate in those respects depends on whether the statute demonstrates "the legislature's intent not only to provide what it considered to be adequate remedies to an employe[e] such as the plaintiff, but by implication show a legislative intent to abrogate or supersede any common law remedy for damages." *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90-91, 689 P2d 1292 (1984). Thus, to succeed, defendant must demonstrate both that the remedy for violation of ORS 659.035 is adequate in comparison to the remedy available under a common-law tort action and also that the legislature intended the statute to abrogate the common law.

Defendant meets the first of those requirements. The statutory remedies available to plaintiffs under ORS 659.035(2) and (3) and ORS 659.121, the enforcement provisions of the general unlawful employment practices statute, include the right to "file a civil suit in circuit court for injunctive relief" and to seek "other equitable relief as may be appropriate," including "reinstatement * * * with or without back pay," ORS 659.121(1); the right to seek "compensatory damages or $250, whichever is greater," ORS 659.035(3); and, if the employee is the "prevailing party," the right to request "costs and reasonable attorney fees at trial and on appeal," ORS 659.121(1).

The general unlawful employment practices statute, then, allows the employee to vindicate the public interest by holding the employer accountable for practices that discourage the reporting of safety concerns. In addition, the statute provides for compensatory damages to rectify the harm done to the employee by the wrongful discipline or termination, vindicating the employee's own private interests. *See Holien,*

298 Or at 90. The statutory remedies adequately compensate the successful plaintiff; a common-law wrongful termination action against a government body adds no additional remedies.[4]

Defendant argues that this fact alone supports the inference that the legislature intended the statutory remedy to supersede the common law. We considered that question under a previous version of the statute, ORS 659.035 (1987),[5] which did not authorize an aggrieved party to seek compensatory damages. We held that, when the legislature initially enacted ORS 659.035,

"[t]here is no indication that * * * the legislature was aware of or intended to abrogate any common law right of action that an employe[e] might have against an employer for a retaliatory discharge. We will not read such a limitation into the statute without its containing a clear statement to that effect. We also conclude that the statutory remedy is inadequate."

*McCool v. Hillhaven Corporation*, 97 Or App 536, 540, 777 P2d 1013, *rev den*, 308 Or 593 (1989). Since *McCool* was decided, the legislature amended ORS 659.035 to add paragraph (1)(b), which makes violation of the whistleblower law an unlawful employment practice, and subsection (3), which permits an aggrieved employee to seek compensatory damages against an employer who engages in that practice. That amendment, however, satisfies only one of the factors that underlie our *McCool* decision: adequacy of remedy. The

---

[4] Punitive damages are not available in a wrongful termination action against a public employer, nor are they available under ORS 659.035 to 659.535.

[5] ORS 659.035 (1987) provided:

"(1) It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employe[e] with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employe[e] has in good faith reported possible violations of ORS chapter 441 or of ORS 443.400 to 443.455 or has testified in good faith at an unemployment compensation hearing or other hearing conducted pursuant to ORS chapter 657.

"(2) Complaints may be filed by employees, and this section shall be enforced by the Commissioner of the Bureau of Labor and Industries in the same manner as provided in ORS 659.040 to 659.110 and 659.121 for the enforcement of an unlawful employment practice. Violation of subsection (1) of this section subjects the violator to the same civil and criminal remedies and penalties as provided in ORS 659.010 to 659.110 and 659.121."

amendments do not address the other factor, "legislative intent to abrogate or supersede any common law remedy for damages," as required under *Holien* and restated in *McCool*.

Defendant contends that we need not address the second factor, because whenever a statute provides an adequate remedy, that fact alone conclusively proves that the legislature intended to supersede the common law. *Farrimond v. Louisiana-Pacific Corp.*, 103 Or App 563, 798 P2d 697 (1990), appears to lend support to that contention. In that case, the employer allegedly violated *former* ORS 659.410(1) by terminating the plaintiff in retaliation for filing a workers' compensation claim. The plaintiff brought an action under that statute and the common law of wrongful termination. The trial court dismissed the common-law claim on the ground that the statute was exclusive, and we affirmed. We held:

> "Although the statute does not expressly state that it is intended to supersede the common law remedy, the legislature's adoption of virtually all remedies that would have been available at common law lead us to conclude that it intended the statutory remedy to be exclusive."

*Farrimond*, 103 Or App at 567.

However, *Farrimond* does not help defendant here. The case might apply when a plaintiff claims violations of the common law and of ORS 659.410(1) regarding retaliation for filing a workers' compensation claim; the statute is silent with respect to the legislature's intent and, in the absence of an explicit statement, the existence of adequate remedies can be seen implicitly to establish exclusivity. The public employee whistleblower statute, however—unlike the statute protecting workers' compensation claimants—does contain an explicit statement of legislative intent: It provides that the statute is "not intended to * * * [r]estrict or impair any judicial right of action an employee or an employer has under existing law." ORS 659.515(6). That language establishes that the legislature clearly and affirmatively expressed its intention that the statutory claim *not* supersede common-law claims.

Further, the legislative history indicates an intent to preserve a plaintiff's right to bring a common-law wrongful termination action. Senate Bill (SB) 1051 (1989), the original whistleblower law, came out of the Senate Labor Committee. The committee chair, Senator Grattan Kerans, when discussing the provision codified in ORS 659.515(6), stated that it would allow a plaintiff who was terminated in retaliation for whistleblowing to "check right into wrongful discharge." Tape Recording, Senate Labor Committee, SB 1051, Apr 24, 1989, Tape 118, Side A (statement of Sen Grattan Kerans). Thus, aggrieved whistleblower plaintiffs were explicitly permitted to sue in tort.[6] Accordingly, plaintiffs' wrongful termination claims were not legally barred due to the existence of an alternative statutory cause of action. The trial court's denial of defendant's motion to dismiss was not error.

■ In its third assignment of error, defendant asserts that the trial court should have granted defendant's motion to dismiss Olsen's claim for assault and each plaintiff's claim for negligence because the workers' compensation system provides plaintiffs' exclusive remedy. That exclusivity, defendant contends, flows from ORS 656.018,[7] ORS 30.265(3)(a),[8]

---

[6] The 2001 Legislative Assembly amended the whistleblower law with the apparent effect of eliminating the problem of double recovery. It did so by repealing ORS 659.035(3) and ORS 659.530. Or Laws 2001, ch 621, §§ 40, 45. Now, an aggrieved plaintiff can seek compensatory damages under ORS 659A.230(3); that statute, in turn, allows plaintiffs to seek common-law remedies. Thus, common-law remedies are now incorporated into the statutory ones.

[7] ORS 656.018 provides, in part:

"(1)(a) The liability of every employer who satisfies the duty required by ORS 656.017(1) is exclusive and in place of all other liability arising out of injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment that are sustained by subject workers * * *.

"* * * * *

"(2) The rights given to a subject worker * * * under this chapter * * * are in lieu of any remedies they might otherwise have * * * against the worker's employer under * * * common law or statute[.]

"* * * * *

"(6) The exclusive remedy provisions and limitation on liability provisions of this chapter apply to all injuries and to diseases, symptom complexes or similar conditions of subject workers arising out of and in the course of employment whether or not they are determined to be compensable under this chapter."

[8] ORS 30.265(3)(a) confers immunity on "every public body" for "[a]ny claim for injury to or death of any person covered by any workers' compensation law."

and the Employer Liability Law, ORS 654.305 to 654.336, as construed in *Trout v. Liberty Northwest Ins. Corp.*, 154 Or App 89, 961 P2d 235 (1998).[9] Accepting as true all well-pleaded allegations in the complaint and giving plaintiff the benefit of all favorable inferences that may be drawn from the facts alleged, *Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999), we conclude that the trial court did not err.

The outcome of the parties' dispute depends on the scope of the Supreme Court's decision in *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), declaring that, in some circumstances, application of the workers' compensation exclusivity provision in ORS 656.018 denies workers a remedy for injuries arising out of and in the course of employment and therefore violates Article I, section 10, of the Oregon Constitution.[10] In *Smothers*, the plaintiff suffered lung damage at work due to chemical exposure attributable to his employer's negligence. Because the exposure occurred in the course and scope of his employment, he filed a workers' compensation claim—his exclusive remedy under ORS 656.018. However, because his on-the-job exposure was not the "major contributing cause" of his occupational disease, the disease was not compensable within the workers' compensation system. ORS 656.802 (no recovery for worker unless employment conditions were major contributing cause of disease); *Smothers*, 332 Or at 87. When he subsequently filed a negligence action—under which he could have received damages from his employer even if his work exposure was *not* the major contributing cause of his disease—the defendant invoked ORS 656.018, arguing that workers' compensation was the plaintiff's only avenue of redress. The plaintiff replied that compelling him to bring what would be a viable common-law negligence action in a forum that provided him no relief, and only in that forum, denied him his

---

[9] In that case, the court noted:

"The Workers' Compensation Act now provides the exclusive remedy for most employees. ORS 656.018. Thus, only employees not covered by the Workers' Compensation Act * * * may now bring an action under the [Employer Liability Law] against their employer."

*Trout*, 154 Or App at 98 n 3.

[10] Article I, section 10, provides, in part, that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

right to a remedy under Article I, section 10. The trial court rejected that argument and granted the defendant's motion to dismiss. *Id.* at 86. This court affirmed. *Smothers v. Gresham Transfer, Inc.*, 149 Or App 49, 941 P2d 1065 (1997).

The Supreme Court reversed. It held that the legislature could not abolish a common-law cause of action that was recognized when the remedy clause was included in the original Oregon Constitution in 1857 unless the law provided a constitutionally adequate substitute remedy. *Smothers,* 332 Or at 124. Applying that rule to the facts, the court held that the exclusivity provision could not constitutionally be applied. Examining early cases, the court concluded that, in 1857, the common law of Oregon would have provided a remedy to a worker who had been injured by the negligence of his employer in failing to provide a safe workplace. *Id.* at 131. It further concluded that, because of the "major contributing cause" rule, the workers' compensation system no longer provided an adequate remedy for a class of those workers: those whose injury was caused in part, but not major part, by the employer. The court summarized as follows:

> "Based on our analysis of the remedy clause of Article I, section 10, we conclude that determining whether the exclusive remedy provisions of ORS 656.018 (1995) violate that clause involves a case-by-case analysis. The first inquiry is whether a workers' compensation claim alleges an injury to an 'absolute' common-law right that the remedy clause protects. If it does, and the claim is accepted and the worker receives the benefits provided by the workers' compensation statutes, then the worker cannot complain that he or she has been deprived of a remedial process for seeking redress for injury to a right that the remedy clause protects. Neither can the worker complain that he or she has been deprived of a remedial process if a compensation claim is denied because the worker is unable to prove that the work-related incident was a contributing cause of the alleged injury, which is what a plaintiff would have had to prove in a common-law cause of action for negligence. However, if a workers' compensation claim for an alleged injury to a right that is protected by the remedy clause is denied because the worker has failed to prove that the work-related incident was the major, rather than merely a contributing, cause of the injury, then the exclusive remedy

provisions of ORS 656.018 (1995) are unconstitutional under the remedy clause, because they leave the worker with no process through which to seek redress for an injury for which a cause of action existed at common law."

*Id.* at 135.

Plaintiff contends that *Smothers* stands for the broad proposition that no statute limiting an injured worker's remedies to those that he or she can obtain from the workers' compensation system can constitutionally be applied if the workers' compensation system does not afford any remedy at all and a common-law cause of action would afford one. Defendant, on the other hand, would limit *Smothers* to its particular facts. The case, according to defendant, "carved out a very limited exception to the exclusive remedy provisions": the provision cannot be applied against a plaintiff whose otherwise meritorious negligence claim against the employer is noncompensable because the plaintiff can "not establish that [the employment] was the major contributing cause of his injury or disease." Thus, defendant argues, even though plaintiff Olsen's workers' compensation claim was denied, she was nonetheless barred by ORS 656.018 from bringing a negligence action because the denial was not based on the "major contributing cause" rule; it was based, rather, on other disqualifying factors.

■ Defendant's interpretation of *Smothers* cannot withstand scrutiny. It is true that the opinion in that case is narrowly written to avoid deciding issues not raised by the facts. It does so, however, only after articulating the general principles that lead to, and compel, the particular outcome. Our task is not to await the Supreme Court's treatment of other particular factual situations, but to apply the Supreme Court's reasoning to such situations as they arise and to the extent that they do not involve significant distinctions. The relevant foundational principles underlying the holding in *Smothers* are these: First, Article I, section 10, prohibits the legislature from eliminating a common-law cause of action for injury to a person unless there is a substitute process for obtaining an adequate remedy in lieu of the remedy that the common law provided for that injury. *Id.* at 124. Second, at common law, a worker had a cause of action for negligence,

and hence a remedy for injury, against an employer for failure to provide a safe workplace. *Id.* at 131. Third, "workers' compensation law no longer provides a remedy for some wrongs or harms occurring in the workplace for which a common-law negligence cause of action had existed when the drafters wrote the Oregon Constitution in 1857." *Id.* at 134. Those precepts lead inevitably to the conclusion that any legislation limiting a worker who alleges negligence against his or her employer for failure to provide a safe workplace to the remedies afforded by the workers' compensation system cannot constitutionally be applied when the workers' compensation system provides no remedy at all.

That being the case, the trial court did not err in denying defendant's motion to dismiss. Plaintiffs' complaint did, as defendant asserts, allege injuries arising from and in the course of their employment. Defendant's answer raised the exclusivity provisions as an affirmative defense. However, the pleadings did not establish the merit of defendant's defense; to prevail under *Smothers*, defendant needed to assert and prove that the exclusivity provisions applied against defendants under the facts of this case—that is, that plaintiff would receive an adequate remedy within the workers' compensation system. At the time of defendant's ORCP 21 motion to dismiss, that issue remained unresolved. The trial court therefore did not err in denying the motion.[11]

Further, that is the only ruling that is properly before us. One of defendant's "Questions Presented on Appeal" is the following:

"Did the trial court err in denying Defendant's motions (Rule 21 Motion, Motion for Summary Judgment, Motion for Directed Verdict, Motion for Judgment Notwithstanding the Verdict) to dismiss Plaintiff Olsen's assault claim, each Plaintiff's negligence claim and each Plaintiff's claim under the Employer Liability Act * * * on the ground that

---

[11] As does defendant, the dissent argues that plaintiffs' claims are barred by the exclusivity provision of ORS 656.018 and by the immunity conferred by ORS 30.265(3). 204 Or App at 45-51 (Edmonds, P. J., dissenting). However, the dissent does not engage the argument that, to the extent those statutes would deprive plaintiffs of a common-law remedy without providing an adequate substitute, they violate Article I, section 10, of the Oregon Constitution and cannot serve to immunize defendant.

each of these claims is barred by [various exclusive remedy provisions]?"

The actual assignment of error, however, specifies the trial court's denial of only "Defendant's motions to dismiss" various claims. It did not "specify the stage in the proceedings when the question or issue presented by the assignment of error was raised in the lower court," ORAP 5.45(4)(a)(i), nor did it "set out pertinent quotations of the record where the question or issue was raised and the challenged ruling was made, together with reference to the pages of the transcript or other portions of the record," ORAP 5.45(4)(a)(ii). If defendant intended to challenge the denial not only of the motion to dismiss under ORCP 21, but also the denial of the other motions (summary judgment, directed verdict, judgment notwithstanding the verdict (JNOV)), it did not do so effectively, that is, by "identify[ing] precisely the legal, procedural, factual, or other ruling that is being challenged." ORAP 5.45(3). Nor did it comply with the requirement that "[e]ach assignment of error shall be separately stated under a numbered heading," ORAP 5.45(2), or the requirement that "each assignment of error shall identify the applicable standard or standards of review," ORAP 5.45(5). Further, defendant's brief presents no argument regarding the asserted insufficiency of the evidence actually adduced at trial to support plaintiff's allegations; defendant's entire argument focuses on the legal sufficiency of the pleadings. We therefore treat the assignment of error as relating only to the motion to dismiss under ORCP 21, and we conclude, as noted above, that the trial court did not err in denying it.[12]

■■ In its fourth assignment of error, defendant argues that, because plaintiffs failed to "exhaust administrative remedies" available to them under their collective bargaining agreement (CBA) and under workers' compensation law, the

---

[12] We note, however, that the parties adduced facts that, along with inferences drawn from them, would allow a jury to conclude that (1) plaintiff Olsen filed a workers' compensation claim and it was denied because it did not result in a "diagnosed condition"; and (2) plaintiffs Reese and Tomitz did not file workers' compensation claims, but their claims would have been substantially identical to Olsen's and therefore denied as well. *See Krushwitz v. McDonald's Restaurants*, 323 Or 520, 525 n 3, 919 P2d 465 (1996) (court refuses to dismiss tort action based on allegedly work-related injury because doing so "would serve no constructive purpose").

trial court should have granted defendant's motion to direct a verdict in its favor on plaintiffs' tort claims. In reviewing the denial of defendant's directed verdict motion, we consider the evidence, including inferences, in the light most favorable to plaintiffs, and we affirm unless "there is no evidence from which the jury could have found the facts necessary" to support the verdict. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). Here, evidence supports the jury's verdict on each tort claim.

Defendant's arguments are misguided, each in a different way. Regarding defendant's argument involving the CBA, "exhaustion" refers to a requirement that the parties avail themselves of contractual dispute resolution procedures and resort to litigation only if those procedures fail. *E.g.*, *Vaughn v. Pacific Northwest Bell Telephone*, 289 Or 73, 89, 611 P2d 281 (1980) ("exhaustion" requirement designed to encourage use of grievance procedures within a CBA). Additionally, an "exhaustion" requirement might be imposed by statute. Here, we note first that Reese was not a union member and therefore not a party to any CBA. Regarding Olsen and Tomitz, we conclude that defendant failed to prove its affirmative defense for two reasons. First, the only page of the CBA included in the record authorizes the County Board of Commissioners to resolve complaints "relating to employment conditions and relationships." It provides no indication that the CBA could resolve the tort claims that plaintiffs ultimately litigated. *See id.* at 90 (no exhaustion requirement where CBA does not address claims actually litigated). Second, the record demonstrates that, before the litigation began, Olsen and Tomitz *did* avail themselves of the three-step dispute resolution process outlined in the CBA and received no relief.

Regarding defendant's exhaustion claim based on the workers' compensation process, defendant misconceives what "exhaustion of administrative remedies" means: a claimant cannot judicially challenge an allegedly erroneous agency process or its allegedly erroneous outcome until he or she has followed the agency's own mechanisms of challenge. It is a "general rule of administrative law" that, regarding matters within the administrative agency's jurisdiction, " '[j]udicial review is only available after the procedure for

relief within the administrative body itself has been followed without success.' " *Mullenaux v. Dept. of Revenue*, 293 Or 536, 539, 651 P2d 724 (1982) (quoting *Miller v. Schrunk*, 232 Or 383, 388, 375 P2d 823 (1962)); *Ayres v. Board of Parole*, 194 Or App 429, 434, 97 P3d 1 (2004). Plaintiffs were not using the judicial system to challenge the outcome of an administrative process; therefore, no "exhaustion" issue exists.

Defendant's fifth assignment of error challenges the trial court's denial of its motion for a directed verdict on Olsen's assault claim. Again, we must affirm unless the record lacks any evidence from which the jury could have found the facts necessary to support its verdict. *Brown*, 297 Or at 705.[13]

As an initial matter, we note that defendant mischaracterizes the basis upon which Olsen argued defendant's liability for assault. Rather than arguing solely that defendant was liable vicariously for the actions of its client, Olsen also argued that defendant was directly liable for G's assault. Under that theory, we affirm the court's denial of defendant's motion.

■ Assault is defined as "an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect." *Cook v. Kinzua Pine Mills Co. et al.*, 207 Or 34, 48, 293 P2d 717 (1956). Olsen's theory of the case, set out in the pleadings and developed at trial, was that defendant, by putting G in Park Place under the supervision of plaintiffs, intentionally attempted to use G to inflict violence on Olsen. G had the ability to do so. This theory finds

---

[13] In its "Questions Presented on Appeal," defendant indicates that it will challenge the denial not only of its motion for a directed verdict, but also of its motion for a JNOV. Like its assignment of error based on the exclusivity of workers' compensation remedies, however, defendant's actual assignment on the assault claim refers to the denial of its "motions to dismiss," without citation to the record and in violation of several rules of appellate procedure. Unlike the argument in its third assignment of error, however, defendant's argument in this assignment clearly indicates that it challenges the sufficiency of Olsen's proof, not the sufficiency of its pleadings. We therefore treat the assignment as relating to the denial of the motion for a directed verdict. Denial of a motion for JNOV is not reviewable on the grounds of insufficient evidence. *Burke v. American Network, Inc.*, 95 Or App 274, 277, 768 P2d 924 (1989).

support in the record adequate to overcome defendant's motion for a directed verdict.

The jury heard testimony that G was admitted to Park Place even though he had a history of violence against staff in other, secure psychiatric hospitals, and only after defendant evicted G from another county-run psychiatric facility because he assaulted another client. On the day defendant admitted G, it knew that G had not taken his medications. G's intake form noted "staff concern about his being a threat." Once admitted, G continued his violent outbursts, destroying furniture and attempting to break a window. He claimed that "he killed people in 1877," spoke of skinning babies and burning them alive, and repeatedly muttered, "kill," "die," and "murder." In a facility-guided outing to a park, G frightened park visitors and other clients. Plaintiffs repeatedly asked defendant to transfer G because he posed a danger to others, but defendant refused, in violation of its own "zero tolerance" aggression policy.

On the day of G's outburst, G's psychiatrist examined him and wrote, "I don't think it is safe for [G] to be here." A staff member then telephoned the manager of Park Place, Norman, to recount G's violent behavior, report the psychiatrist's assessment, and recommend an immediate transfer because, in her opinion, an assault was imminent. Norman refused to take action, but decided to think about the issue. He then went to lunch. Within an hour, G charged Olsen in a threatening manner, and in doing so, committed the alleged assault.

That evidence is sufficient to withstand a motion for directed verdict on the assault claim. By abdicating its authority to restrain G and refusing to transfer him despite its own zero tolerance aggression policy, defendant affirmatively placed G in a setting where he could freely harm others, particularly female staff whom G was known to target. Further, in light of the gravely strained relations between management and employees, the jury could have determined that G was purposefully loosed on the women who had often complained about lax safety measures and whose complaints were met with efforts to silence them and termination. The evidence, when viewed as a whole, permitted the jury to

determine that, by retaining G despite his violent outbursts and by providing him with potential victims and the opportunity to do harm, defendant, through its agents, intentionally attempted to inflict harm on plaintiffs. *Cf. Walthers v. Gossett*, 148 Or App 548, 553-54, 941 P2d 575 (1997) (where complaint alleged that defendant corporation "scheduled dental appointments for minor female patients, and that it furnished the examination room, facilities and equipment, providing Gossett with both his victims and the opportunity to molest them," and if that corporation, through its agents, intended tortious result, facts would be sufficient to establish liability of corporation for actions of orthodontist under theory that corporation aided and abetted orthodontist's battery).

Defendant raises two arguments against this conclusion. First, it argues that G lacked the requisite level of intent to inflict harm. Defendant made that argument for the first time in its motion for a JNOV; for that reason, we need not consider it here. *Wampler v. Sherwood*, 281 Or 261, 270, 574 P2d 319 (1978) (motion for JNOV cannot be based on grounds not raised by motion for directed verdict). In any event, G's mental state is not relevant; under Olsen's theory of liability, it is the mental state of defendant, not of its human instrumentality, that matters. Defendant, under Oregon law, "may be liable for * * * another's torts under any one of the three theories identified in *Restatement* section 876." *Granewich*, 329 Or at 55. One such theory is as follows:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> "* * * * *
>
> "(b)  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]"

*Restatement (Second) of Torts* § 876 (1979). The comment to section 876 explains that the rule applies whether or not "the other" (here, G) "knows his act is tortious." *Restatement* at § 876 comment b.

Second, defendant contends that no evidence supports the inference that G attacked (or intended to attack)

Olsen; the facts show that he burst into a small room occupied by Olsen and another employee, Lantz, and that only Lantz was the immediate object of G's outburst. Again, however, it is defendant's intent, not G's, that matters, and, as we conclude above, the evidence suffices to support the inference that defendant loosed G on all of its employees with the intention that G inflict violence on them and that Olsen was harmed as a result.

In its sixth assignment of error, defendant asserts that the trial court should have granted its motion for a new trial. Defendant asserted in its motion that a new trial was warranted because the trial court should have dismissed Olsen's assault claim and each plaintiff's negligence claim, and that by failing to dismiss those claims, the trial court improperly permitted the jury to hear unfairly prejudicial evidence concerning G's outburst. As explained above, however, the trial court did not err in denying defendant's motions to dismiss plaintiffs' tort claims. Insofar as defendant assigns error to the admission of evidence concerning G, the assignment is not well taken. Thus, we have rejected the premise on which this assignment of error depends.

Affirmed.

**EDMONDS, P. J.,** dissenting.

The majority and I view the record and the issues that the parties brief quite differently in this case, which leads to my disagreement with the majority's reasoning as set out more fully below. The following reflects my understanding from the record of what occurred in the trial court.

There are three plaintiffs in this case, Misa Olsen, Melanie Reese, and Denise Tomitz. They were all employed by defendant Deschutes County at a short-term residential mental health facility in August 2000, when according to their complaint, certain events occurred that led to the end of their employment with defendant. Plaintiffs filed their initial complaint in circuit court in December 2000 and an amended complaint in November 2001. Defendant filed ORCP 21 motions against plaintiffs' amended complaint. The trial

court denied those motions in April 2002. Thereafter, defendant moved for summary judgment, which the trial court denied in May 2003.

Also, in May 2003, plaintiffs filed their second amended complaint, the complaint on which the case eventually would be tried. In the second amended complaint, plaintiffs Olsen and Tomitz alleged violations of ORS 659.510, ORS 659.035, and ORS 659.530 in their first claim.[1] The parties thereafter referred to those claims as the "whistleblower claims." In their second claim, all plaintiffs alleged common-law wrongful discharge claims. In the third claim, Olsen alleged that she was the victim of an assault by a client, for which defendant was directly or vicariously liable. In the fourth claim, all plaintiffs alleged that defendant was guilty of negligence, which resulted in their injuries and damages. In the fifth claim, all plaintiffs alleged that defendant was liable to them under the Employer Liability Act ("ELA"), ORS 654.305 to ORS 654.335.

Defendant admitted that plaintiffs had been employed by defendant, but otherwise denied plaintiffs' claims. In addition, defendant alleged as affirmative defenses that the first claim (the whistleblower allegations) was barred by the 90-day statute of limitation in ORS 659.530. As to plaintiffs' second claim, defendant affirmatively alleged that common-law wrongful discharge was not legally cognizable because plaintiffs had available to them an adequate statutory remedy and that Olsen and Reese had "voluntarily resigned [their] employment with Defendant." As to plaintiffs' third (assault of Olsen), fourth (negligence) and fifth (ELA) claims, defendant affirmatively alleged that plaintiffs' exclusive remedy was under the Oregon workers' compensation law and that defendant was immune under the Oregon Tort Claims Act. Defendant also alleged, in response to the third and fourth claims for relief, that recovery was barred by plaintiffs' comparative fault and their failure to exhaust available administrative remedies before commencing this action.

---

[1] As in the majority opinion, all statutory references are to the 1999 versions unless otherwise noted. As the majority points out, many of the provisions at issue in this litigation have subsequently been amended or repealed.

After the case was tried, the jury returned the following verdicts:

First Claim (Whistleblower):   As to Olsen, the jury found for defendant. As to Tomitz, the jury found for her and awarded $83,880 in back wages and benefits and $25,000 for emotional distress.

Second Claim (Common-Law Wrongful Discharge): The jury returned verdicts in favor of all plaintiffs. It awarded Olsen $29,676 in back wages and benefits and $20,000 for emotional distress. It awarded Reese $3,000 in back wages and benefits and $20,000 for emotional distress. It awarded Tomitz $83,880 in back wages and benefits and $25,000 for emotional distress.

Third Claim (Assault of Olsen):   The jury found for Olsen on the third claim and awarded her $35,000 for emotional distress.

Fourth Claim (Negligence):   The jury returned verdicts for all plaintiffs. It awarded Olsen $29,676 for lost wages and benefits, Reese $3,000 for lost wages and benefits, and Tomitz $83,880 for lost wages and benefits.

Fifth Claim (ELA):   The jury returned verdicts for all plaintiffs. It awarded Olsen $29,676 for lost wages and benefits and $15,000 for emotional distress. It awarded Reese $3,000 for lost wages and benefits and $15,000 for emotional distress. It awarded Tomitz $83,880 in lost wages and benefits and $25,000 for emotional distress.

Thereafter, the trial court entered judgment for Olsen in the amount of $99,676 plus prejudgment interest on her back pay award. As to Reese, the court entered judgment in the amount of $38,000 plus prejudgment interest on her back pay award. As to Tomitz, the court entered judgment for $158,880 plus prejudgment interest on her back pay award. Defendant appeals and makes six assignments of error.

## I.   THE FIRST ASSIGNMENT OF ERROR

The issue under defendant's first assignment of error is whether Tomitz's first claim for relief, based on the whistleblower allegations, should have been dismissed as

untimely under the 90-day statute of limitation in ORS 659.530, which applied to actions brought pursuant to ORS 659.510.[2] This contention was first raised by defendant in its ORCP 21 motions against the amended complaint. As stated above, defendant also raised the issue as an affirmative defense in its answer and then moved for a directed verdict and, later, judgment notwithstanding the verdict, on that ground. On appeal, under the heading of "Questions Presented on Appeal," defendant in its brief frames the rulings on all three motions as error, referring to the denial of its *"motions * * * to dismiss."* (Emphasis added.) In its first assignment of error, defendant repeats its inartful practice. Apparently, because the legal issue is identical, defendant has elected to include all three rulings under one assignment of error. That practice is problematical because different standards of review apply, depending upon which ruling is being reviewed by this court.[3]

The majority resolves the dilemma of which standard of review to apply by construing defendant's assignment of error as if it were solely a challenge to the sufficiency of the complaint, the proper subject of an ORCP 21 motion. 204 Or App at 10. One flaw in that approach is that defendant's ORCP 21 motions were made against the amended complaint and not the second amended complaint on which the case was tried. Because defendant pleaded the bar of the statute of limitation as an affirmative defense and the issue presents a question of law based on undisputed facts, I would review the trial court's ruling under ORCP 60 (motion for directed verdict). By proceeding in that manner, we are more faithful to the actual language of defendant's assignment of error. Moreover, no prejudice to Tomitz occurs if we take that approach. It is clear from the record and the parties' briefing on appeal that the issue framed in the first assignment was repeatedly litigated in the trial court and that Tomitz had the opportunity to respond to it in this court.

---

[2] As noted above, the jury found in favor of defendant with respect to Olsen's whistleblower allegations.

[3] In fact, that practice is inconsistent with ORAP 5.45(2) and (3), which contemplate separate assignments of error for separate rulings.

At trial, plaintiffs offered evidence that they complained repeatedly to county officials that their supervisor failed to abide by Park Place's admission criteria and that the county failed to provide them with adequate safety equipment in light of the dangerousness of the admittees. In plaintiffs' view, defendant responded to their complaints by firing Tomitz for insubordination on August 7, 2000. Tomitz initially pleaded her first claim for relief (based on the whistleblower allegations) on December 27, 2000, more than 90 days after she was fired. Defendant's motions for a directed verdict and judgment notwithstanding the verdict squarely presented the legal question to the trial court of whether Tomitz's claim was time-barred. Because defendant's first assignment of error challenges those rulings as well, and because Tomitz is not prejudiced by the combination of the challenged rulings under a single assignment, I would review the denial of defendant's motion under ORCP 60, regardless of the confusion created by defendant's brief.

On the merits, the majority concludes:

"The plain meaning of ORS 659.035 cannot support defendant's theory that, as a matter of statutory construction, when violation of ORS 659.510 serves as a basis for relief for ORS 659.035, the claim is governed by the 90-day statute of limitation in ORS 659.530. In declaring that it is an unlawful employment practice for a 'public employer to *violate* ORS 659.510,' ORS 659.035(1) simply specifies that a whistleblower violation is one form of prohibited conduct. It does not incorporate a separate statute of limitation for a claim based on violation of ORS 659.510 but brought under ORS 659.035."

204 Or App at 12-13 (emphasis in original). Later in its opinion, the majority declares:

"Here, the 90-day limitation under the whistleblower statute and the one-year limitation under the unlawful employment practices statute do not, in fact, conflict. As we interpret them, the 90-day limitation in ORS 659.530 applies to actions brought solely under the statute; when, as here, the action is brought under ORS 659.035, then the limitation period within that statute applies."

204 Or App at 13.

The majority's conclusions do not withstand scrutiny. Because the above issue involves statutory construction, our task is to discern the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Did the legislature intend for the 90-day statute of limitation in ORS 659.530 to apply only to actions brought under ORS 659.510, or did it intend ORS 659.530 to apply to all whistleblower claims, whether brought under ORS 659.510 or ORS 659.035?[4] As in any analysis involving the intent of the legislature, we turn first to the text of the applicable statutes and then consider them in context.

ORS 659.510 and ORS 659.530, the relevant whistleblower statutes, and ORS 659.035, the statute defining unlawful employment practices in Oregon, were part of a common statutory scheme to protect employees. ORS 659.510(2) provided that "[n]o public employer shall invoke or impose any disciplinary action against an employee for employee activity described in subsection (1) of this section or ORS 659.525." ORS 659.530, in turn, provided for a civil action based on a violation of the Whistleblower Law, and included a measure of damages and an applicable statute of limitation:

> "In addition to appeal proceedings of ORS 240.560 for a state employee and any comparable provisions for employees of political subdivisions and remedies available under ORS 659.035, an employee alleging a violation of ORS 659.510 may bring a civil action for appropriate injunctive relief or damages, or both, within 90 days after the occurrence of the alleged violation. The action may be filed in the circuit court of the county in which the alleged violation occurred, or the county in which the complainant resides. If damages are awarded, the court shall award actual damages or $250, whichever is greater."

At the time that ORS 659.510 was enacted, ORS 659.035(1) defined "unlawful employment practices," and ORS 659.121 provided for a civil action based on any such unlawful employment practices. As part of the enactment of ORS 659.510, ORS 659.035 was amended to specifically

---

[4] ORS 659.530 was renumbered as ORS 659A.215 in 2001. The 90-day statute of limitations was subsequently repealed.

include a violation of ORS 659.510 within the definition of an "unlawful employment practice."[5] Further, at the time of the enactment of ORS 659.510 and ORS 659.530, ORS 659.121(3) provided, as it did at all relevant times in this case, that a civil action "shall be commenced within one year of the occurrence of the alleged unlawful employment practice."

The majority posits that the 90-day statute of limitation for whistleblower actions does not conflict with the one-year statute of limitation for unlawful employment practices because the 90-day limitation applies solely to actions brought pursuant to ORS 659.530. "When construing related statutory provisions, we are not to omit what has been inserted, and we are to construe multiple provisions, if possible, *in a manner that will give effect to all." Bolt v. Influence, Inc.*, 333 Or 572, 581, 43 P3d 425 (2002) (emphasis added); *see also* ORS 174.010. The majority violates that rule of construction, which must be considered at the first level of analysis under *PGE*. Under the majority's view of the statutory scheme, a plaintiff could effectively avoid the 90-day period of limitation in ORS 659.530 simply by characterizing his or her whistleblower claim as an unlawful employment practice claim, thereby invoking a one-year limitation period. But that construct effectively renders the 90-day statute of limitation in ORS 659.530 meaningless because a plaintiff could always ignore that limitation period in favor of the longer one-year period in ORS 659.121(3). Had the legislature intended that result, there would have been no need for its promulgation of ORS 659.530.

Further, the majority's construct fails to account for the sequence in which the statutes were enacted, and the obvious interplay between ORS 659.530 and ORS 659.035. ORS 659.530 and ORS 659.035(1)(b) were enacted in 1989,[6] after the enactment of ORS 659.121(3) in 1977.[7] "As part of

---

[5] As part of the same act, ORS 659.035 was amended to allow a party aggrieved under ORS 659.035, as a result of a violation of ORS 659.510, to seek "compensatory damages or $250, whichever is greater." Or Laws 1989, ch 890, § 10.

[6] Or Laws 1989, ch 890, §§ 7, 10.

[7] Or Laws 1977, ch 453, § 6.

the first level of a *PGE* analysis, we adhere to the rule of statutory construction that a specific statute controls over a general statute." *Kambury v. DaimlerChrysler Corp.*, 334 Or 367, 374, 50 P3d 1163 (2002). Thus, "when one statute deals with a subject in general terms and another deals with the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, while giving effect to a consistent legislative policy." *State v. Guzek*, 322 Or 245, 268, 906 P2d 272 (1995); *see also* ORS 174.020(2) ("When a general and particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a general intent that is inconsistent with the particular intent."). When the legislature enacted ORS 659.530 in 1989, it was keenly aware of ORS 659.035 and certainly would have been aware that a one-year statute of limitation governed other kinds of unlawful employment practices. Nevertheless, it enacted at that time a specific 90-day statute of limitation for whistleblower claims while at the same time declaring that such violations also constituted unlawful employment practices.

Because ORS 659.035, ORS 659.121, and ORS 659.530 are all part of a common statutory scheme to provide remedies for unlawful employment practices and address the same subject matter, they must be considered together.[8] *See Fresk v. Kraemer*, 337 Or 513, 520-21, 99 P3d 282 (2004) ("Statutory context includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the statute was enacted."). We cannot ignore the legislature's enactment of a more specific time period when a longer limitation period already existed. The above rules of statutory construction require us to conclude that a whistleblower claim, whether alleged as a claim under ORS 659.510 or under ORS 659.035, must be subject to the shorter statute of limitation set forth in ORS 659.530. *See, e.g., Kambury*, 334 Or at 374-75 (holding that the two-year statute of limitation for product liability cases under ORS 30.905(2) controls in wrongful death cases arising from product defects rather

---

[8] *See* ORS 659.010 (providing common definitions for ORS 659.010 to 650.110 and ORS 659.400 to 659.545); ORS 659.022 (identifying common purpose for ORS 659.010 to 659.110 and ORS 659.400 to 659.545).

than the three-year limitation period for wrongful death actions generally under ORS 30.020). It follows that the trial court should have concluded that Tomitz's claim of unlawful employment practices was untimely under ORS 659.530.[9]

In summary, the trial court erred when it failed to grant defendant's motions for a directed verdict and judgment notwithstanding the verdict on Tomitz's whistleblower claim. The judgment on that claim should be reversed.

## II. THE SECOND ASSIGNMENT OF ERROR

The second assignment of error frames the issue whether plaintiffs' common-law wrongful discharge claims are legally cognizable in light of the statutory remedies provided by the legislature. Plaintiffs' claims are based on the theory that they were terminated in retaliation for their complaints regarding safety violations and mismanagement at the Park Place facility. Defendant argues that plaintiffs' claims should have been dismissed as a matter of law because plaintiffs had an adequate statutory remedy for those claims.

---

[9] Alternatively, Tomitz argues that the 90-day period commenced on September 28, 2000, and that her claim would have been timely regardless of whether the shorter limitations period were applicable. After being terminated on August 7, 2000, Tomitz filed a grievance through her union grievance process. That grievance ultimately was denied by the board of county commissioners on September 28, 2000. Tomitz argues that the time period for filing her whistleblower claim began at that time, and that the filing of her action in circuit court on December 27, 2000, was therefore timely. However, under the plain language of the statute, the 90-day period commenced under ORS 659.530 when defendant allegedly violated ORS 659.510 by discharging her from employment, not when it later refused to remedy that allegedly unlawful conduct through the grievance process. Cf. Stupek v. Wyle Laboratories Corp., 327 Or 433, 440, 963 P2d 678 (1998) (plaintiff's employment relationship conclusively ended with her termination because it was not until that date "that all the facts necessary for plaintiff to prove her wrongful-discharge claim had occurred"). Indeed, Tomitz alleged in the complaint that defendant "involuntarily terminated" her on "August 7, 2000," and that it "discharged * * * Tomitz in retaliation for Plaintiffs' complaints regarding violations of safety rules and mismanagement of the Park Place facility." Moreover, Tomitz written grievance stated that "I was discharged on August 7, 2000" and requested that defendant "reinstate me, pay back wages and benefits and make me whole." Thus, as of August 8, 2000, all the events necessary for Tomitz to prove her claim had occurred. Although her alleged damages from her termination may have been mitigated or satisfied had defendant granted her grievance, ORS 650.530 is clear on its face: the 90-day period commences upon the occurrence of the statutory violation and is not contingent on any subsequent remedial conduct by the employer.

In *Dunwoody v. Handskill Corp.*, 185 Or App 605, 60 P3d 1135 (2003), we traced the Supreme Court's jurisprudence regarding the common-law action for wrongful discharge from employment. We noted that the court first recognized the action in *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975). *Dunwoody*, 185 Or App at 609. Two years after *Nees*, the court concluded in *Walsh v. Consolidated Freightways*, 278 Or 347, 563 P2d 1205 (1977), that an employee who was terminated for reporting safety violations could not bring a common-law wrongful discharge claim because the employee had an adequate statutory remedy (*i.e.*, via a complaint to the United States Department of Labor) to vindicate the important societal interest at stake. One year after *Walsh* was decided, the court decided *Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978), and held that an employee terminated for filing a workers' compensation claim could bring a common-law wrongful discharge claim because his statutory remedy was inadequate. In *Brown*, the court reasoned that the employee's statutory remedy was insufficient to protect the interest at stake because (1) the commissioner of the Bureau of Labor and Industries had discretion to investigate the employee's complaints and was not required to do so, and (2) there was no basis on which an employee could appeal the commissioner's decision not to investigate the complaint. *Dunwoody*, 185 Or App at 611.

The court, in *Delaney v. Taco Time Int'l*, 297 Or 10, 681 P2d 114 (1984), later "synthesized those decisions, concluding that they effectively divided into three categories." *Dunwoody*, 185 Or App at 611. We explained the three categories as follows:

"The first category encompasses cases, such as *Nees*, in which the plaintiff was discharged 'for fulfilling a societal obligation.' The second category encompasses cases in which the plaintiffs were discharged for pursuing private statutory rights, such as in [*Campbell v. Ford Industries, Inc.*, 274 Or 243, 546 P2d 141 (1976),] and *Brown*. * * * The third and final category, typified by *Walsh*, includes cases in which an employee was discharged for reasons that frustrated an important societal interest but 'an existing remedy protects the interests of society so that there is no need to extend an additional remedy for wrongful discharge.' "

*Dunwoody*, 185 Or App at 611 (internal citations omitted).

We then addressed cases decided after *Delaney*, and held that "[t]wo relevant principles emerge from [our] review of Oregon law." *Dunwoody*, 185 Or App at 613. First, an action for common-law wrongful discharge is designed to fill a gap where a violation of public policy would otherwise not be adequately remedied. Second, the tort performs the gap-filling role in cases in which the discharged employee was at will, as in *Nees*, or protected by statutory provisions or a collective bargaining agreement, as in subsequent cases. *Dunwoody*, 185 Or App at 613. "In *Nees*, the court created the tort because the plaintiff in that case otherwise would not have had a remedy." *Id.* In a subsequent case, the court "concluded that there were remedies available to the plaintiffs but that those remedies were not adequate." *Id.* at 613-14. Thus, we summarized, "where existing remedies will not fully vindicate the public interest, the tort of wrongful discharge steps in to fill that gap." *Id.* at 614.

It is in light of this background that we must determine whether the legislature, by enacting ORS 659.510 and ORS 659.121(1) and (2), intended to abrogate the common-law remedy of wrongful discharge under the circumstances alleged by plaintiffs. This court has specifically held that the enactment of ORS 659.121(1) and (2), and the remedies provided by those statutes (including a right to a jury trial in circuit court, equitable remedies of reinstatement with back pay, and compensatory and punitive damages) demonstrate such an intent. *See Farrimond v. Louisiana-Pacific Corp.*, 103 Or App 563, 798 P2d 697 (1990). In *Farrimond*, we held that, "[a]lthough the statute does not expressly state that it is intended to supersede the common law remedy, the legislature's adoption of virtually all remedies that would have been available at common law lead us to conclude that it intended the statutory remedy to be exclusive." *Id.* at 567. Accordingly, we held that an employee who was terminated in retaliation for pursuing remedies under the workers' compensation law could not state a claim for wrongful discharge. *Id.* at 568. That holding is consistent with the Supreme Court's suggestion in *Brown* that the provision of an adequate statutory remedy would, by necessary implication, demonstrate an

intent to abrogate the common-law claim for wrongful discharge.[10]

Here, the question presented by defendant's second assignment of error is whether, by necessary implication, the legislature by the enactment of statutory remedies is deemed to have intended to abrogate a common-law right of action for wrongful discharge under the circumstances alleged by plaintiffs. If it has, then the trial court erred in awarding judgment to plaintiffs on their common-law wrongful discharge claims. The majority and I agree on at least two points. The majority correctly acknowledges that the issue, properly framed, is whether the legislature expressly or implicitly intended the statute to supersede common law. 204 Or App at 13-16. Also, the majority correctly acknowledges that "[t]he statutory remedies adequately compensate the successful plaintiff; a common-law wrongful termination action against a government body adds no additional remedies." 204 Or App at 15. My disagreement with the majority lies in its assertion that the legislature has "clearly and affirmatively expressed its intention that the statutory claim *not* supersede common-law claims." 204 Or App at 16 (emphasis in original).

The majority relies on the language of ORS 659.515(6) in support of its assertion that the legislature has

---

[10] In *Brown*, the court observed:

"As a general rule, if a statute which provides for a new remedy shows no intention to negate, either expressly or by necessary implication, a pre-existing common law remedy, the new remedy will be regarded as merely cumulative, rather than exclusive, with the result that a plaintiff may resort to either the pre-existing remedy or the new remedy. This rule is particularly applicable when the new statutory remedy is not an adequate one. Prior decisions of this court are consistent with this general rule."

284 Or at 610-11 (internal footnotes omitted). The court, in *dictum*, then stated:

"Upon application of this rule to this case it may well be that we would conclude that the provisions of ORS ch 659, as they now exist subsequent to the amendments enacted by the Oregon legislature in 1977 (and under which an employee discharged for making a claim for worker's compensation can elect to file either a complaint with the Commissioner of the Bureau of Labor or a civil suit for injunctive and 'such other equitable relief as may be appropriate'), not only provide adequate remedies to an employee such as plaintiff, but, by necessary implication, show a legislative intent to abrogate or supersede any previously existing common law remedy for damages, even though the legislature might not then have been aware of the existence of such a remedy." *Id.*

expressly provided that the statutory claims available to plaintiffs do not supersede their common-law claims. That statute provided:

"ORS 240.316, 659.035 and 659.505 to 659.545 are not intended to:

"* * * * *

"(6) Restrict or impair any judicial right of action an employee or an employer has under existing law."

The majority's assertion must be scrutinized in accordance with the customary rules regarding statutory interpretation. We examine first the text of the statute in context with other related statutes. The key words in ORS 659.515(6) are the words "restrict or impair any judicial right of action." In the context of ORS chapter 659, the word "restrict" means to "check, bound, or decrease the range [or] scope" of the judicial right of action. *Webster's Third New Int'l Dictionary* 1937 (unabridged ed 2002). Similarly, the word "impair" in ORS 659.515(6) within the context of ORS chapter 659 means "to diminish in quantity" any judicial right of action. *Id.* at 1131. A "judicial right of action" refers to any action that could be brought, whether based on a statutory right or the common law. I agree that the plain language of ORS 659.515(6) would preserve a common-law right of action for wrongful discharge if the existing statutes did not provide a complete remedy to plaintiffs. But, of course, as the majority acknowledges, plaintiffs have all the remedies under ORS 659.035 and ORS 659.510 that were available to them at common law. In other words, no judicial right of action has been restricted or impaired, *i.e.*, has been decreased or diminished in quantity by any statutory provision enacted by the legislature. Rather, the legislature has simply substituted a complete set of statutory remedies for the remedy that existed at common law under the circumstances alleged by plaintiffs. The necessary implication of that fact is that plaintiffs' common-law remedies are abrogated. Thus, the majority is incorrect when it posits that ORS 659.515(6) constitutes an affirmative expression by the legislature to retain the common-law action of wrongful discharge along with the available statutory remedies. In other words, there is no "gap" in the law wherein the existing remedies available to

plaintiffs do not fully vindicate the public interest in providing an adequate remedy to them. *Dunwoody,* 185 Or App at 613.

Additionally, the majority relies on a statement of Senator Grattan Kerans made when the legislature was considering the enactment of ORS 659.515(6). 204 Or App at 17. According to Senator Kerans, the enactment of the statute would allow a plaintiff who was terminated in retaliation for whistleblowing to "check right into wrongful discharge." That isolated statement made by one member of the legislature during a committee meeting says nothing about whether the legislature intended to retain a common-law remedy in addition to the statutory remedies it had enacted. In fact, the statement more likely refers to the relationship between ORS 659.515 through 659.545 and an employee's other codified rights. For instance, as indicated previously, ORS 659.035(1)(b) expressly makes a violation of ORS 659.510 an unlawful employment practice. When understood in that context, ORS 659.515(6) may express the legislature's intent that no provision in the whistleblower statutes is meant to otherwise restrict or impair an employee's rights under the remainder of ORS chapter 659. Regardless, the existence of common-law remedies is dependent on an underlying public policy to provide an adequate remedy for a wrong. That need no longer exists, as the majority implicitly concedes. I would hold that the trial court erred when it failed to dismiss plaintiffs' claims for common-law wrongful discharge.

### III.   THE FIFTH ASSIGNMENT OF ERROR

I turn next to the fifth assignment of error for reasons that will become apparent later. In its fifth assignment of error, defendant argues that there is insufficient evidence to support a verdict against it on Olsen's assault claim, arguing that there is no evidence that the client who assaulted Olsen was acting on behalf of defendant. The majority holds that there is evidence in the record from which a trier of fact could find that defendant was directly liable for the patient's assault on Olsen. I disagree for the reasons that follow.

Olsen alleges in her second amended complaint that "[d]efendant participated in, aided, or procured the assault"

and that "[d]efendant understood, knew or should have known that an assault would be committed by [the client] on Plaintiff[.]" In plaintiffs' brief, Olsen argues that "a jury could find the County directly liable for the assault because the County aided and assisted in the assault and is thus a joint tortfeasor [with the client who actually assaulted Olsen]." According to Olsen, defendant's direct liability is predicated on the following facts, related in the light most favorable to her claim:

(1) Park Place had a "zero-tolerance" policy regarding assaultive behavior, and a client demonstrating such behavior would be immediately discharged.

(2) Client G had a documented history of violence and assaults on staff of psychiatric facilities and that history was known to defendant before it admitted G to Park Place on August 7, 2000.

(3) G had previously been evicted from another facility operated by defendant after he assaulted a fellow client. Following that assault, he was admitted to the psychiatric ward of a hospital where he continued to be violent.

(4) G was admitted to Park Place despite his report that "he didn't take his medications today." After being admitted, he "nearly punched through a glass window in [a] bedroom," destroyed a chair and a snow shovel, and punched out the rails of a deck. While at Park Place, he made repeated threats of violence. He stated that he "killed people in 1877" and talked about skinning babies and burning them alive. He repeatedly muttered, "kill," "die," and "murder."

(5) According to Olsen's complaint, she was assaulted by G on August 11, 2000. Olsen offered testimony that, between the time of G's admission and that date, staff had requested that G be discharged from Park Place and committed to a hospital because he was a danger to others. On the morning of August 11, G was examined by a Dr. Hyde, who opined that G was unsafe and needed to go to a hospital. A staff member telephoned defendant's program manager and told him that, in her view, an assault by G was imminent. The manager told the staff member that he needed to think about it, that he was going to lunch, and that he would call back in an hour.

(6) According to Olsen, "an hour was too late." G burst through the office door of Defendant's Park Place facility and lunged for a staff member who was in the room. Olsen, then eight months pregnant was a short distance away. The staff member testified, "She [Olsen] was just frozen in place. She—she looked like she was in shock. She was just standing right—the last place I—I had seen her stand, right to the side of the door[.]"

(7) The staff member commanded G to "stop." He complied and was transferred to the hospital for evaluation and treatment.

An "assault" in the civil context is an intentional attempt to injure another person with force or violence. *Cook v. Kinzua Pine Mills Co. et al.*, 207 Or 34, 48, 293 P2d 717 (1956). A person who does not take any active part in, or aid, abet, advise or procure the commission of an assault is not liable for an assault that is committed by someone else. *Tauscher v. Doernbecher Mfg. Co.*, 153 Or 152, 160, 56 P2d 318 (1936). For a person to be liable for the intentional tort of another, two legal requirements must be satisfied. First, the defendant must have participated in or aided and assisted in the assault in some way. *Paur v. Rose City Dodge*, 249 Or 385, 389, 438 P2d 994 (1968). Second, the defendant's participation in the assault must have been with the requisite mental state, *i.e.*, defendant must have intended the harmful or offensive contact or least understood that the assault was going to be committed against Olsen at the time defendant aided G. *See Gymnastics USA v. McDougal*, 92 Or App 453, 458, 758 P2d 881, *rev den*, 307 Or 77 (1988) (acquiescence to an intentional tort of another is not a sufficient basis for liability; to be liable as a co-actor in the commission of an intentional tort, a person must understand that a tort is being or will be committed by the other person when he assists or encourages that person).

According to the majority, Olsen's theory at trial was that, "by putting G in Park Place under the supervision of plaintiffs, [defendant] intentionally attempted to use G to inflict violence on Olsen." 204 Or App at 24. In the majority's view,

"[the] evidence is sufficient to withstand a motion for directed verdict on the assault claim. By abdicating its

authority to restrain G and refusing to transfer him despite its own zero tolerance aggression policy, defendant affirmatively placed G in a setting where he could freely harm others, particularly female staff whom G was known to target. Further, in light of the gravely strained relations between management and employees, the jury could have determined that G was purposefully loosed on the women who had often complained about lax safety measures and whose complaints were met with efforts to silence them and termination."

204 Or App at 25.

The majority's analysis is flawed both factually and legally. First, G's assault was directed at the staff member and not at Olsen. Olsen happened to be a bystander who was in the room when the assault occurred. There is no evidence that G's assault was directed at Olsen. Second, Olsen had tendered her resignation on August 10, 2000, effective August 14. The majority's inference that the jury could have found that G was purposefully loosed on Olsen to silence her complaints—the day after she already had resigned—is simply not supported by the evidence. That may be the reason why Olsen does not make the argument that the majority makes for her. Third, there is no evidence that any agent of defendant participated with G, aided G in any manner in the assault, advised G, encouraged G, or promoted or procured G's conduct. No agent of defendant prompted G to burst into the staff member's office or to assault her. Fourth, there is no evidence that, at the time of defendant's actions and omissions, G's assault was ongoing. All of defendant's conduct about which plaintiff complains occurred *before* the assault occurred and without defendant's knowledge that G intended to assault the staff member.

At best, the evidence, viewed in the light most favorable to Olsen, demonstrates that defendant refused to transfer G to a more secure facility or exercise more control over him within the facility despite information that he was dangerous and prone to violence. That conduct may constitute negligence, but it does not amount to evidence that defendant directly aided and assisted G or that defendant had the requisite mental state to be liable for the intentional tort of

assault. Even if an inference could be drawn from the evidence that defendant affirmatively placed G in a setting where he was free to harm others, there is no evidence or available inference that any of defendant's agents[11] *knew* that G was going to assault Olsen *at the time* that G burst into the staff member's office.

The majority also relies on a statement from *Walthers v. Gossett*, 148 Or App 548, 941 P2d 575 (1997), in support of its conclusion. In that case, a patient sued her orthodontist and the successor to the orthodontist's professional corporation for injuries caused when the orthodontist sexually abused her as a teenager. The corporate defendant moved to dismiss the plaintiff's battery claim under ORCP 21, arguing that it could not be held directly liable for the intentional torts of its employees and that it was not vicariously liable under the facts alleged by the plaintiff. The trial court granted the motion, and the plaintiff appealed. On appeal, we reversed. We began our analysis by observing that battery is an intentional tort and that, to be liable for battery under an "aiding and assisting" theory, a defendant must have participated in, aided, or procured the battery. Moreover, such a defendant must have acted with the requisite mental state, that is, it must have intended the harmful or offensive contact. The defendant in *Walthers* argued on appeal that a corporation cannot directly engage in intentional tortious acts. We rejected that premise, observing that, under an aiding and assisting theory, a corporation could be liable for an intentional act by an agent if it facilitated the agent's torts with the intent or knowledge that the tortious conduct would occur. 148 Or App at 553. We concluded that the plaintiff's pleading could be reasonably understood to allege that the corporation was directly liable to the plaintiff. The corporation sole officer of which was the orthodontist, scheduled the appointments for the plaintiff. We therefore reasoned that it could be inferred, in light of the fact that the orthodontist was the sole officer of the corporation, that the corporation facilitated the battery of the plaintiff with the

---

[11] Defendant, as a nonsentient entity, cannot intend anything apart from the intent of its human agents. *See State v. Oregon City Elks*, 17 Or App 124, 130, 520 P2d 900 (1974) ("Since a corporation is not a natural person, it can, by definition, act only through its officers and agents.").

knowledge that she would be abused during her appointments. *Id.*

Of course, this case is factually dissimilar to *Walthers.* For Olsen to prevail on her theory of direct liability, there must be some evidence from which a reasonable inference could be drawn that defendant's supervisor or program manager intended that Olsen be assaulted and that one or both of those persons acted pursuant to that intent to facilitate G's conduct in the staff member's office. Unlike in *Walthers*, there is no evidence that defendant acted in concert with G or aided and assisted G with the requisite knowledge to be directly liable for the intentional tort of assault. It follows that the trial court erred when it denied defendant's motion for a directed verdict on Olsen's claim for assault.

## IV.  THE THIRD ASSIGNMENT OF ERROR

I turn to plaintiffs' remaining claims which are based on common-law negligence and the Employer's Liability Act.[12] In the third assignment of error, defendant argues that those claims are barred by the exclusivity provisions of ORS 656.018 and the immunity provided to public entities under ORS 30.265(3)(a) for any claim for injury to a person covered by the workers' compensation law. As was the case with defendant's first assignment of error, defendant assigns as error the denial of its "motions to dismiss." In this assignment, defendant argues that the

> "alleged injuries to each Plaintiff under each of these claims occurred during the course and scope of each Plaintiff's employment with Defendant and, therefore, are barred by the exclusive remedy provisions of the Workers Compensation Law (ORS 656.001 *et seq.*) and the Workers Compensation immunity provision of the Oregon Tort Claims Act (ORS 30.265(3)(a))."

The majority treats defendant's assignment as assigning as error only to the trial court's ruling regarding defendant's ORCP 21 motions against plaintiffs' original

---

[12] All of the named plaintiffs are plaintiffs for purposes of the fourth claim of the second amended complaint based on the theory of negligence and the fifth claim for relief based on violations of the ELA.

complaint. In fact, however, defendant asserted as an affirmative defense against plaintiffs' third, fourth, and fifth claims for relief that the workers' compensation law was their exclusive remedy, asserting that those claims "allege injuries arising out of and in the course of plaintiffs' respective employments with Defendant." Thereafter, defendant moved for a directed verdict and for a judgment notwithstanding the verdict on the same ground. Because the issue framed by the third assignment of error was properly presented to the trial court on those occasions and focuses on the same legal issue, I would review the third assignment of error as encompassing the trial court's rulings in that regard under ORCP 60.[13]

Here, according to defendant, it is undisputed that defendant is a covered employer under the provisions of ORS 656.017(1), that each plaintiff qualifies as a "subject worker" under ORS 656.027, and that each of the plaintiff's injuries occurred during the course and scope of her respective employment with defendant. Plaintiffs respond that there is evidence that brings plaintiffs' claims under ORS 656.156(2).[14] That statute provides:

"If injury or death results to a worker from the deliberate intention of the employer of the worker to produce such injury or death, the worker * * * may take under this chapter, and also have cause for action against the employer, as if such statutes had not been passed, for damages over the amount payable under those statutes."

---

[13] Once again, I perceive no prejudice to plaintiffs as a result of defendant's failure to set out the rulings under separate assignments of error. From their brief, it is apparent that plaintiffs understood the nature of the issues on appeal and were able to respond to all of the arguments presented under the single assignment.

[14] I disagree with the majority's conclusion that the parties' dispute depends on the scope of the Supreme Court's decision in *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001). Plaintiffs reference *Smothers* as part of a "*see*" citation in their response brief, and provide no argument as to why, as in *Smothers*, the application of the exclusive remedy provisions of ORS 656.018 violates Article I, section 10, of the Oregon Constitution. Plaintiffs make no effort to demonstrate, as did the plaintiff in *Smothers*, that "there was no remedial process available under present workers' compensation laws." *Id.* at 136. Instead, plaintiffs focus their argument on the exception to the exclusive remedy provisions found in ORS 656.156(2). For that reason, my analysis centers on that statute, and not on *Smothers*.

In plaintiffs' view, ORS 656.156(2) saves their third, fourth, and fifth claims because "defendant knowingly exposed Plaintiffs and their co-workers to a violent individual experiencing delusional ramblings" and to HIV and hepatitis C without providing adequate protection.

The leading case on this issue is *Kilminster v. Day Management Corp.*, 323 Or 618, 919 P2d 474 (1996). The Supreme Court's construction of ORS 656.156(2) in *Kilminster* is binding on us as if its construction had been expressly written into the language of the statute at the time of its enactment. *Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995). According to the *Kilminster* court,

> "The meaning of [ORS 656.156(2)] is clear from this court's prior interpretations. In order for a worker to show that an injury that occurred during the course and scope of the worker's employment 'result[ed] * * * from the deliberate intention of the employer * * * to produce' that injury, the worker must show that the employer determined to injure an employee; that is, had a specific intent to injure an employee; that the employer acted on that intent; and that the worker was, in fact, injured as result of the employer's actions."

323 Or at 631. The question then in this case is whether a reasonable trier of fact could find, based on the evidence produced by plaintiffs and all reasonable inferences that arise therefrom, that defendant had a specific intent to injure each of the plaintiffs. If that standard is not satisfied, defendant was entitled to the grant of its motion for a directed verdict as to each plaintiff.

I will begin by discussing plaintiffs' contention that their negligence and ELA claims survive the exclusive remedy provisions of the workers' compensation law because defendant "knowingly exposed Plaintiffs and their co-workers to a violent individual experiencing delusional ramblings." Tomitz's employment was terminated on August 7, 2000, *before* the incident with G that occurred on August 11. Reese was an on-call employee. When she learned of Tomitz's termination, she submitted her resignation effective August 10, 2000, also before the incident with G. There is no evidence that either Tomitz or Reese was present at the time of the

August 11 incident or was ever harmed by G. There simply is no evidence from which a jury could infer that defendant specifically intended to expose Tomitz and Reese to a violent outburst by G.

As to Olsen, I have already explained why the evidence regarding G's conduct does not support an inference that defendant had the specific intent to injure her. As noted above, there is no evidence that the assault was directed at Olsen; it was directed at another staff member when Olsen happened to be in the room. The assault happened *after* Olsen had tendered her resignation, thereby negating any inference that G was "loosed" on Olsen to silence her complaints. And there is no evidence that any agent of G participated with G, aided G, or otherwise advised, encouraged, promoted, or procured G's conduct. In other words, to the extent that Olsen relies on G's conduct as evidence of defendant's specific intent to injure her, Olsen is unable to demonstrate that defendant determined to injure her through G's actions, that defendant acted on that intent, and that she was, in fact, injured as the result of defendant's actions.

That conclusion is consistent with *Kilminster* and *Weis v. Allen,* 147 Or 670, 35 P2d 478 (1934), the two cases in which the Supreme Court has found facts sufficient to give rise to an inference of specific intent. In *Kilminster*, the plaintiff alleged

> "that [the employer] *knew* that decedent or someone who did the same work as decedent *would* be injured from a fall from the tower; that [employer] decided to forego taking safety procedures, *knowing* that, by so doing, serious injury or death *would* result; and that [employer] told decedent to climb the tower or lose his job."

323 Or at 632 (emphasis in original). Those allegations, the court held, were sufficient facts from which a jury could infer that the employer had a specific intent to injure the plaintiff. In *Weis*, the plaintiff was shot by a spring gun set by the employer on the employer's property.

There is a significant difference between *Kilminster* and *Weis* and the facts in this case. Here, defendant was aware that G was potentially dangerous, and did not take

safety precautions to mitigate that potential danger. However, defendant did not specifically direct Olsen to encounter certain harm from G. In fact, the evidence established that Olsen merely happened to be in the room in which G directed his aggression toward another employee. Under *Kilminster* and *Weis*, there were essentially two ways in which Olsen could have demonstrated defendant's specific intent to harm her by an assault from G: (1) by producing evidence that defendant directed G to harm her; or (2) by producing evidence that defendant specifically directed her into a situation where G was certain to harm her. Neither type of evidence is present here. Olsen's evidence establishes only that the harm to her was the result of defendant's failure to protect against a known risk. That is a different scenario from those in *Kilminster* and *Weis*, in which the employer deliberately instructed its employee to encounter certain harm (*Kilminster*) or injured the employee through the use of an instrumentality deliberately designed to inflict harm (*Weis*).[15]

The remaining prong of plaintiffs' theory in support of their negligence[16] and ELA claims essentially involves the following allegation:

> "Plaintiffs' employment with Defendant involved a risk or danger of injury to Plaintiffs or the public, including risk of exposure to contagious diseases, such as HIV or Hepatitis C, and unstable and potentially violent residents admitted to Park Place."

It is noteworthy that plaintiffs' fourth and fifth claims in their second amended complaint do not allege that defendant undertook to deliberately injure them. Plaintiffs' other allegations of negligence in their second amended complaint allege a failure to adequately train plaintiffs' supervisors, a failure to implement "necessary policies and procedures," a

---

[15] As discussed above, the theory that G could be considered an instrumentality of harm, absent any evidence that defendant directed him or otherwise encouraged him to assault Olsen, is not tenable.

[16] Because a negligence claim ordinarily does not require a showing of specific intent, we note once again the unique posture of these claims. Because plaintiffs' negligence claims are otherwise barred by the exclusive remedy provisions of the workers' compensation law, plaintiffs must prove the additional element of intent with respect to the negligence claims if they are to prevail.

failure "to make sure there was follow through" by their supervisor on policy and procedure, and a failure to address the supervisor's "poor communication skills."

In their response to defendant's third assignment of error, plaintiffs refer to certain portions of the evidentiary record in support of their argument that the trial court did not err in denying defendants' motions based on the exclusivity provisions of the workers' compensation law. That evidence supports a reasonable inference that defendant refused to provide certain safety equipment to plaintiffs even after plaintiffs requested that the equipment be provided; that defendant was aware of the protection that the equipment could provide from exposure to HIV or hepatitis C; and even that the equipment would have been relatively inexpensive.

But more is required. Each of the plaintiffs must prove a deliberate intent to injure, that defendant acted on that intent, and that plaintiffs were in fact injured as a result of defendant's actions. Proof of gross negligence, carelessness, recklessness, or even conscious indifference to a substantial risk of injury does not suffice under the statute. *Kilminster*, 323 Or at 633.[17] Although a specific intent to produce an injury may be inferred from the surrounding circumstances, there must be some fact in evidence from which such an inference can reasonably be drawn. Here, plaintiffs point to no evidence that would allow a reasonable factfinder to draw such an inference beyond the fact that defendant was aware of the risk of not providing safety equipment. Yet the only inferences from that fact fall within the range of mental states referred to above; they do not provide a basis for an inference of *deliberate* intent. In those cases in which the issue has been the sufficiency of the evidence (as opposed to the sufficiency at the pleading stage, such as in *Kilminster*), the Supreme Court has required more evidence than the fact that the employer was aware of the risk and failed to respond

---

[17] Defendant's motion for a directed verdict challenges the sufficiency of plaintiffs' evidence, unlike in *Kilminster*, where the standard of review required the court to give the plaintiff the benefit of all reasonable inferences that arose from the facts pleaded.

as plaintiff requested. *See Kilminster*, 323 Or at 630-32 (noting that the Supreme Court had previously only once held that a plaintiff satisfied its burden of proving deliberate intention, in a case involving an employer's use of spring guns set to fire at anyone coming in contact with them).

In the absence of any additional evidence regarding defendant's mental state in exposing plaintiffs to the risk of HIV or hepatitis C (such as evidence that defendant specifically and knowingly directed plaintiffs to handle fluids containing HIV or hepatitis C contaminants without proper protection), plaintiffs have not produced, as the statute requires, evidence from which a reasonable trier of fact could find that it is more likely than not that defendant acted with the deliberate intent to injure them. I conclude therefore that the trial court should have granted defendant's motions for a directed verdict on plaintiffs' remaining claims.

For the reasons stated above, defendant was entitled to judgment in its favor as a matter of law on each of plaintiffs' claims. The judgment should therefore be reversed as to all plaintiffs.

For the above reasons, I dissent.