Argued and submitted October 3, 2005, judgment on second claim against Huffman
and on first, third, fourth, and sixth claims against City of Scappoose
reversed and remanded; otherwise affirmed September 27, 2006,
petition for review denied February 21, 2007 (342 Or 416)

## Margo DEW,
*Appellant,*

*v.*

## CITY OF SCAPPOOSE,
a municipal corporation,
and James D. Huffman,
in his personal capacity,
*Respondents.*

## 01-2080; A123026

145 P3d 198

Maureen Leonard argued the cause for appellant. With her on the briefs were Linda L. Marshall and Martha Takaro.

Robert E. Franz, Jr., argued the cause for respondent City of Scappoose. On the brief were Jason M. Montgomery and Law Office of Robert E. Franz, Jr.

Ronald B. Terzenbach argued the cause for respondent James D. Huffman. With him on the brief were Daniel M. Holland and Loomis & Holland.

Before Landau, Presiding Judge,* and Brewer, Chief Judge, and Deits, Judge pro tempore.

LANDAU, P. J.

---

* Landau, P. J., *vice* Wollheim, P. J.

## LANDAU, P. J.

Plaintiff is the former Chief of Police of the City of Scappoose. She initiated this action against the city and Huffman, a Scappoose city councilor, asserting a variety of claims arising out of the termination of her employment and the circumstances leading up to the termination. Plaintiff settled one of her claims against Huffman and entered into a covenant not to execute as to another. Meanwhile, the city moved for summary judgment on all of the claims against it and moved to dismiss Huffman from the action on the ground that the settlement agreement and covenant not to execute rendered the action moot as to that party. The trial court granted the city's motion for summary judgment and entered judgment dismissing all claims against the city. The court also granted the city's motion to dismiss Huffman from the action. Plaintiff now appeals, assigning error to the trial court's decisions on both motions. We conclude that the trial court erred in granting the motion for summary judgment as to several of the claims. We also conclude that the trial court erred in dismissing the claim against Huffman on mootness grounds. We therefore affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

We state the relevant facts in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

A. *Facts leading up to the filing of the complaint*

In February 1998, the city hired plaintiff to be its police chief. During the time that she occupied that position, defendant Huffman was a city councilor. Huffman also was an attorney in private practice whose practice included representing criminal defendants. On several occasions, according to plaintiff, Huffman attempted to use his position on the city council to benefit his law practice. For example, plaintiff recalls that Huffman pressured her to obtain dismissal of a stalking order against a client. Plaintiff refused to help him.

In 1998, plaintiff filed complaints against Huffman with both the Government Standards and Practices Commission (GSPC) and the Oregon State Bar. Meanwhile, Huffman began criticizing plaintiff at city council meetings and on his personal website. Huffman also made frequent telephone calls to plaintiff that resulted in heated exchanges between them. The city council censured Huffman for his behavior.

Matters came to a head over a public controversy regarding a speech that plaintiff gave at a local high school. Plaintiff took questions from the student audience. An unsigned written question asked why the police in town were so corrupt. Plaintiff asked the students whether the person who wrote the question had "the balls" to admit it and either defend it or provide more information. Then, a student asked why the police "write tickets that are really kind of * * *" and then he started to say "chickenshit," but plaintiff finished the sentence for him. She told him that there are no "chickenshit" tickets because there are no "chickenshit" laws.

Plaintiff later went back to the school and apologized for her language, but that did not end the controversy. Huffman brought the issue before the city council. Many witnesses at the meeting expressed strong discontent with plaintiff and complained that her apology was insincere.

On January 24, 2000, plaintiff met with the city manager, Gillham, who told plaintiff, "You are screwed. Your career is screwed. I don't know what you are going to do. I don't see how you are ever going to recover from this." Gillham gave her the choice of resigning or being fired. Plaintiff refused to resign and, on her way out of Gillham's office, picked up a chair and threw it on the ground. The chair was then blocking the doorway, so she picked it up and threw it out of her way and slammed the door behind her.

The following day, Gillham wrote to plaintiff that he planned to speak with the city's legal counsel before deciding whether to terminate her. In the meantime, Gillham placed plaintiff on administrative leave for one week, citing the "outburst and loss of control in my office" as the sole reason for his decision. Gillham insisted that plaintiff submit to an evaluation by a psychologist approved by the city.

Plaintiff did so. The city's psychologist concluded that plaintiff's outburst was "extraordinary and not representative of [plaintiff's] behavior" and was caused by the repeated public attacks on her character. The psychologist recommended that plaintiff take six to eight weeks off work to engage in psychological counseling. He also recommended "that the City Council act in some meaningful way to manage the seemingly toxic ongoing behavior of Mr. Huffman."

Plaintiff followed the psychologist's recommendation and took some time off work. In the interim, plaintiff filed a workers' compensation claim for work-related stress. SAIF Corporation (SAIF), the city's workers' compensation insurer, accepted the claim.

On March 31, 2000, Gillham sent plaintiff a letter terminating her employment. He explained that the public's expectations for a chief of police are high, and he could not "overlook or excuse even an isolated instance of serious, poor judgment and misconduct. I place throwing office furniture in this category." Although Gillham asserted that throwing office furniture constituted cause for termination, he opted to officially dismiss plaintiff "without cause" so that, under the terms of her employment agreement, she could receive severance pay.

Meanwhile, SAIF and plaintiff settled her workers' compensation claim and executed a Claims Disposition Agreement (CDA), which provided, in pertinent part:

"The parties also agree to the following: Due to limitations related to claimant's accepted adjustment disorder with mixed emotional features, *claimant has not returned to, and medical evidence indicates that claimant will not be able to return to, regular employment* as defined in OAR 436-110-0005 under the most recent disabling claim opening. Claimant has not refused an offer of appropriate employment with the employment at injury. Medical documentation from claimant's treating psychiatrist indicates that claimant has permanent disability as a result of the adjustment disorder and claimant would have been awarded permanent impairment had the claimant had the claim closed rather than being resolved by this claims disposition agreement."

(Emphasis added.)

B. *Facts pertaining to the litigation of plaintiff's claims*

On March 5, 2001, plaintiff initiated this action against the city and Huffman for a variety of claims arising out of her termination and the events leading up to it. Plaintiff alleged six claims for relief against the city and two claims against Huffman.

With respect to the city, plaintiff alleged that (1) the city violated 42 USC section 1983 by retaliating against her for exercising her First Amendment right to free speech; (2) the city violated the whistleblowing provisions of *former* ORS 659.510(2) (1999), *renumbered as* ORS 659A.203 (2001), and *former* ORS 659.530 (1999), *renumbered as* ORS 659A.215 (2001) and *amended by* Or Laws 2001, ch 621, § 45; (3) the city is liable for common-law wrongful discharge; (4) the city violated *former* ORS 659.436, *renumbered as* ORS 659A.112 (2001), by discriminating against plaintiff on the basis of a stress-related disability; (5) the city violated *former* ORS 659.448 (1999), *renumbered as* ORS 659A.136 (2001) by discriminating against plaintiff based on the results of her psychological exam and inquiries related to her disabled status; and (6) the city violated *former* ORS 659.410 (1999), *renumbered as* ORS 659A.109 (2001) by discriminating against her on the basis of her application for workers' compensation benefits.

With respect to Huffman, plaintiff alleged that (1) Huffman violated 42 USC section 1983 by retaliating against her for exercising her rights of free speech; and (2) Huffman is liable for common-law intentional interference with economic relations.

The city answered and alleged a number of affirmative defenses, including that all claims are time-barred. The city then moved for summary judgment on each of the claims against it. The city argued that, among other things, all of plaintiff's claims are barred by the applicable statutes of limitations and that, on the merits, the undisputed facts demonstrate that the city is entitled to judgment on each of those claims as a matter of law. The trial court denied the motion explaining that "[t]here are genuine issues of material fact as

to all pending motions that preclude granting any. And even if there were not genuine issues of material fact, still I would hold that the moving parties are not entitled to judgment of law in any respect."

Meanwhile, plaintiff and Huffman entered into an Agreement and Covenant not to Execute. In the agreement, the plaintiff agreed to dismiss her claim against Huffman for intentional interference, while Huffman consented to discontinue his attacks on plaintiff and her character. The parties also agreed to continue to litigate the remaining civil rights claim to judgment. Plaintiff, however, agreed not to attempt to enforce any resulting judgment that exceeded Huffman's insurance provided by the city. As to that last matter, the agreement contained, in particular, the following provisions:

"3. [Plaintiff] agrees that she will not attempt to enforce any Judgment rendered against Huffman in this case, except to the extent that any such Judgment against Huffman may be collectible or enforceable from the City of Scappoose or any liability insurance, including any policy of insurance issued to the City of Scappoose or Huffman as an insured of such coverage.

"4. Huffman assigns to [plaintiff] his rights against the City and/or any liability insurance policy or carrier and agrees to fully cooperate in any post judgment collection or enforcement action on the judgment, if any, should such action be taken by [plaintiff] to enforce any judgment rights against the City of Scappoose or any applicable insurance policy or carrier * * *.

"5. Should any judgment be entered against Huffman in this action, [plaintiff] agrees not to have such judgment docketed or to take any action to place a lien or other encumbrance on Huffman's property * * *.

"* * * * *

"7. This agreement and covenant is not intended to release Huffman as a defendant in the lawsuit on the remaining issues or hinder his rights, duties or obligations to defend himself in the lawsuit on any remaining claims against him. Nor is this agreement intended to restrict Huffman from cooperating in his defense under any liability insurance policy under which he may have a duty to cooperate, i.e., [plaintiff] recognizes that Huffman denies

liability under [section 1983] and will present a defense to such claims."

When the city learned of the agreement, it moved to dismiss Huffman from the case on the ground that his settlement with plaintiff rendered her claim against him moot. According to the city, the effect of the agreement was to leave Huffman with no personal exposure because plaintiff had agreed not to enforce any judgment against him that was not covered by his insurance through the city. Under the circumstances, the city argued, plaintiff's remaining civil rights claim against Huffman was no longer justiciable. The trial court agreed and dismissed the claim against Huffman.

The parties proceeded to trial. Plaintiff filed a motion *in limine* to exclude as irrelevant any evidence of the CDA that she had entered into with SAIF in settlement of her workers' compensation claim. The city responded that the CDA was admissible to establish an offset of plaintiff's workers' compensation benefits against any recovery in this action. The city further argued that the CDA was admissible as evidence that plaintiff's claims were barred by the exclusive remedy provisions of the workers' compensation law and by principles of issue and claim preclusion.

At that point, the trial court expressed the opinion that the existence of the CDA cast new light on the case. The court *sua sponte* decided to reconsider its earlier denial of the city's summary judgment motion. The court then granted the motion on the ground that the CDA had issue and claim preclusive effect. The court added that, even assuming that the CDA did not have that effect, it would reconsider its prior decision and grant the city's motion "in all respects on each and all of the bases set forth by the City."

## II. ANALYSIS

On appeal, plaintiff assigns error to the court's decision to grant summary judgment in favor of the city and to grant the city's motion to dismiss the remaining claim against Huffman on mootness grounds. We address each of those assignments in turn.

## A.  *First assignment: Summary judgment in favor of the city*

Plaintiff's first assignment of error targets the trial court's decision to grant summary judgment in favor of the city. She challenges the decision on a number of different grounds. She begins by asserting that the trial court erred in *sua sponte* reconsidering its earlier denial of the city's motion. In the alternative, she argues that, even if the trial court did not err in reviving the previously denied summary judgment motion, it erred in taking into account the CDA with SAIF. And, assuming that was not error, she argues that, on the merits, the trial court erred in granting the summary judgment motion.

### 1.  *Reconsideration of the summary judgment motion*

■       We begin with the trial court's decision to reconsider, *sua sponte*, its earlier denial of the city's motion for summary judgment. Plaintiff complains that a long line of decisions beginning with *Industrial Underwriters v. JKS, Inc.*, 90 Or App 189, 750 P2d 1216 (1988), makes clear that it is reversible error for a trial court to enter summary judgment *sua sponte*. The city responds that the trial court actually did not act *sua sponte*. According to the city, it had filed a motion for summary judgment months earlier and the trial court simply "did not grant it at the time of the hearing."

In point of fact, the trial court did not simply withhold decision on the city's motion. It plainly and expressly denied it. Then, months later, prompted by *plaintiff's* motion *in limine*, the trial court on its own decided to reconsider that earlier decision to deny the motion.

That said, it is clear that the facts of this case do not implicate the rule announced in *Industrial Underwriters*. In that case, the parties appeared on the day of trial, before the jury had been impaneled. The trial court, without any prior motions from the parties, announced that it was prepared to grant summary judgment for the defendant. The defendant propitiously rose and moved for summary judgment. The plaintiff objected, but the trial court overruled the objection. On appeal, we reversed, explaining that there simply had been no motion for summary judgment and, more importantly, no opportunity for the parties to prepare evidence and

arguments on the question whether there remained genuine issues of material fact. 90 Or App at 190.

This case was not in the same posture. The city had moved for summary judgment, the parties had had full opportunity to prepare evidence and arguments on the question whether there remained genuine issues of material fact, and the trial court had ruled on that question. After that, the trial court changed its mind, albeit without having been prompted by a motion to do so.

Thus, strictly speaking, the trial court did not grant summary judgment *sua sponte*, at least not in the sense that the judge did in *Industrial Underwriters*. What the trial court did in this case was *reconsider* its earlier decision *sua sponte*. Plaintiff does not cite—and we are not aware of—any authority that deprives trial courts of the authority to do that. *Cf. Brock v. State Farm Mutual Auto. Ins. Co.*, 195 Or App 519, 524 n 5, 98 P3d 759 (2004) (noting that supplemental local rule expressly allowed trial court to reconsider "any previously-filed motions").

2. *Significance of the CDA as a ground for summary judgment*

■ Plaintiff next argues that the trial court erred in granting summary judgment on the ground that the CDA barred her claims. According to plaintiff, the CDA had the effect of releasing SAIF from any future *workers' compensation* claims, but did not have the effect of either releasing or barring *tort* claims against the city. The city responds that, by its terms, the CDA operated as a release of all future claims arising out of the facts pertaining to her claim, including tort claims against the city. In the alternative, the city argues that the recitals of fact that formed the basis of the CDA are fundamentally inconsistent with the claims that she now advances and, as a result, those are barred by preclusion principles.

We begin with the argument that the CDA operated as a release of all claims, not just workers' compensation claims. In brief, we agree with plaintiff that the CDA does not have the broad effect that the city claims.

Several provisions in the agreement drive our conclusion. First, as we have noted, the agreement specified that it covered conditions resulting "from this claim for occupational injury or disease." It did not include other claims within the scope of its coverage. Second, the agreement stated that it settled plaintiff's claim against SAIF, which suggests that the settlement was limited to workers' compensation claims, as opposed to all claims that plaintiff might have against the city. Third, the agreement's definition of the "compensation and payment" that plaintiff agreed to release mentioned only disability and other benefits recoverable under ORS chapter 656. Finally, the agreement stated that it was entered into "pursuant to ORS 656.236," the statute governing CDAs. That statute makes clear that such agreements release only those rights that arise under the workers' compensation law. Subsection (8) of the statute provides, "No release by a worker or beneficiary of any rights *under this chapter* is valid, except pursuant to a claim disposition agreement under this section[.]" (Emphasis added.)

The city insists that, under *Rash v. McKinstry Co.*, 331 Or 665, 20 P3d 197 (2001), a CDA has broader effect, as a matter of law. According to the city, *Rash* stands for the proposition that a CDA "affects not only rights to workers' compensation recoveries; it also extends to tort recoveries arising out of the same injury."

*Rash*, however, is not quite that broad. In *Rash*, the claimant injured his neck and back at work. The employer's insurer accepted the injuries as work-related and provided benefits to the claimant. In the meantime, the claimant pursued a tort claim against a third party who was involved in the accident that caused the injuries. The claimant eventually settled his workers' compensation claim and entered into a CDA with the insurer. Under the terms of the CDA, the claimant received approximately $125,000 in benefits. The CDA did not preserve the insurer's lien rights against any recovery that the claimant might obtain against the third party. The claimant later settled with the third party, who agreed to pay the claimant $400,000. The insurer then sought to recover from the claimant the $125,000 in benefits that it had paid. The claimant argued that there was no mention of the insurer's lien rights in the CDA and that the

CDA had effectively waived those rights. *Rash*, 331 Or at 667.

The Supreme Court agreed. The court concluded that ORS 656.236(1) provides that the effect of a CDA is to resolve "all matters * * * potentially arising out of claims," and that the insurer's lien rights were such a matter that, in fact, did arise out of the claimant's workers' compensation claim. *Rash*, 331 Or at 672-73. *Rash*, thus stands for the proposition that, under ORS 656.236(1), a CDA has the effect of resolving all matters potentially "arising out of *a claim*," that is, a workers' compensation claim.

In this case, plaintiff's claims against the city do not arise out of her workers' compensation claim itself. At best, one of her claims arises out of the fact that she had filed a claim. But we conclude that such a claim is not the sort that the court referred to in *Rash*. Moreover, the other claims— relating to violations of section 1983, to her wrongful termination, to her whistleblowing activities, and the like—plainly do not arise out of her workers' compensation claim and are thus not barred by the CDA. The trial court erred in reaching a contrary conclusion.

We turn to the question whether anything else in the CDA precluded plaintiff from bringing claims related to her termination. As we have noted, the city argues that the CDA contains recitals that are inconsistent with her current claims and thus bar those claims under principles of issue preclusion. In particular, the city relies on the recital that, *before her termination*, when she had filed her workers' compensation claim, she was "not able to return to work." According to the city, plaintiff cannot now complain that she was terminated from her employment when her CDA conclusively establishes that she could not return to work at that time. As a matter of law, the city argues, the CDA establishes that she had no right to continued employment and cannot seek, among other things, lost wages.

Plaintiff responds that the theory of her case is that she initially began suffering from an adjustment disorder before she was terminated and needed to take a temporary leave because of that adjustment disorder. At that point, however, her inability to work was only temporary. Plaintiff

insists that the plan, proposed by the city's psychologist, was that plaintiff would take six weeks off and then return to work and that the city would use that time to rein in Huffman and thereby alleviate the harassing environment that was causing plaintiff's adjustment disorder. According to plaintiff, her inability to work did not become permanent until the city, instead of remedying the harassing work environment, terminated plaintiff's employment. The termination, plaintiff argues, exacerbated her condition and rendered her permanently unable to return to the workforce. She asserts that the CDA is entirely consistent with her theory of the case.

We agree that the CDA is not necessarily inconsistent with plaintiff's claims in this case. It states that plaintiff "has not been able to return to the workforce following the industrial injury" and that "medical evidence indicates that claimant will not be able to return to regular employment * * *." Nothing in those provisions is inconsistent with plaintiff's theory of the case that, at the time of her initial "injury" and the filing of her workers' compensation claim, she was temporarily unable to return to work and that she did not become *permanently* unable to return to regular employment until the city terminated her and thereby exacerbated her condition. The trial court erred in concluding otherwise.

### 3. *Alternative grounds for summary judgment*

The city argues that we should nonetheless affirm the trial court's decision on one of the other grounds advanced in its original motion for summary judgment. One of those grounds applies to all of plaintiff's claims, and the balance are claim-specific. In addition, the city advances a number of new arguments that it suggests are alternative grounds for affirmance not previously argued. We reject without discussion the new arguments not previously advanced and address each of the remaining arguments in turn.

#### a. Whether all claims are time-barred because of lack of service

The city argues that plaintiff never properly served it with the summons and that, as a result, the action against

it actually has never commenced and, in the meantime, the statutes of limitations applicable to each of the claims has long since expired. Plaintiff responds that the city waived that defense, because the city did not raise it in a responsive pleading or a motion to dismiss. The city replies that it adequately raised the issue of the sufficiency of service when it pleaded its statute of limitations defense. We agree with plaintiff.

ORCP 21 G provides that certain defenses, including insufficiency of service of summons or process, are waived unless raised in either the responsive pleading or a motion to dismiss. ORCP 21 A imposes further requirements on raising those defenses; it states that the defenses raised in the motion to dismiss or responsive pleading "shall be stated specifically and with particularity." To meet those requirements of specificity and particularity, a responsive pleading or motion to dismiss must separately state each defense being raised under ORCP 21 A. In other words, a defendant cannot "piggyback" one defense on another.

In *Adams and Adams*, 173 Or App 242, 21 P3d 171 (2001), for example, the husband moved to set aside a default judgment on the ground that the court lacked personal jurisdiction over him. The motion did not mention insufficiency of service of summons or process. Only in reply to the wife's response to that motion did the husband first mention the insufficiency of service. We concluded that, because the reply memorandum "was not [the] husband's first opportunity to raise that defense to the trial court, [the] husband waived it." *Id.* at 252.

The same reasoning applies to this case. The city pleaded as an affirmative defense that plaintiff's claims were barred by the statute of limitations. It did not raise the defense of insufficiency of service until its motion for summary judgment. Although the city may be correct that proper service is required to commence an action within a limitations period, ORCP 21 A identifies the statute of limitations and insufficiency of service of process as separate affirmative defenses. Under *Adams*, because the city did not raise the defense of insufficiency of service at the first available opportunity, it waived that defense. We therefore reject the city's

arguments that none of plaintiff's claims was ever commenced and turn to the city's claim-specific arguments about why summary judgment was proper.

### b. Plaintiff's first claim for relief

■ In her first claim, plaintiff alleged that the city terminated her for exercising her First Amendment rights in complaining about Huffman, in violation of 42 USC section 1983.[1] The city argues that summary judgment was proper on that claim because, even viewing the evidence in the light most favorable to plaintiff, no reasonable juror could find in her favor on each element. *See* ORCP 47; *Hunsperger v. USF Reddaway, Inc.*, 195 Or App 144, 149, 96 P3d 1277 (2004) (stating summary judgment standard).

■ To prevail on a claim that a government employer punished a public employee for exercising her free speech rights, the employee must first show that her speech was constitutionally protected—*i.e.*, that she was speaking as a citizen on a matter of public concern, *see Garcetti v. Ceballos*, 547 US ____ , 126 S Ct 1951, 1958, 164 L Ed 2d 689 (2006), and that the speech in question was a "substantial or motivating factor" for the adverse employment action, *Board of County Comm'rs v. Umbehr*, 518 US 668, 675, 116 S Ct 2342, 135 L Ed 2d 843 (1996). If the employee discharges that burden, the governmental defendant may escape liability by showing that it would have taken the same action even in the absence of the protected conduct or that the termination was justified because of a sufficiently strong countervailing government interest. *Id.*

In this case, the city does not dispute that plaintiff spoke as a citizen on a matter of public concern. Instead, it argues that there is no genuine issue of fact as to whether plaintiff's speech was a substantial motivating factor in her termination. According to the city, plaintiff's theory is that she was terminated because of the complaints that she filed

---

[1] 42 USC section 1983 provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

against Huffman with the Bar and the GSPC. Because those complaints were filed in 1998, the city asserts that they are too remote in time to give rise to an inference that plaintiff was terminated because of them. In addition, the city asserts that Gillham's letter to plaintiff in January 2000 establishes that the sole reason for her termination was the incident in Gillham's office in which she twice threw the chair and then slammed the door as she left.

Plaintiff argues that her complaint alleges—and the record on summary judgment shows—that, between March 1998 and January 2000, she made various complaints to both city and state officials regarding Huffman's conduct, those complaints addressed matters of public concern, and they were therefore protected under the First Amendment. According to plaintiff, the theory of her case is not, as the city asserts, that she engaged in protected speech and was then terminated for it two years later. It is instead that she continued to engage in protected speech up until the time of her suspension in January 2000. As for the effect of Gillham's letter, plaintiff argues that, although the letter certainly cited the office incident as the reason for the termination, other evidence in the summary judgment record creates at least a genuine issue of material fact as to whether the incident actually was Gillham's only motivation. In particular, plaintiff argues, her own affidavit makes clear that, even before the incident, Gillham told her that her career was "screwed" and that, one way or the other, she was going to lose her job.

We agree with plaintiff and reject the city's argument that plaintiff's speech, as a matter of law, was too temporally removed from the adverse employment action to have been a substantial or motivating factor in her termination. We likewise agree with plaintiff that, from the evidence in the summary judgment record, a reasonable factfinder could find that Gillham had already decided to terminate plaintiff by the time of the chair-throwing incident and that that incident was not the sole reason for plaintiff's termination, as the city urges.

In the alternative, the city argues that summary judgment was appropriate on plaintiff's first claim because,

as a matter of law, it is not liable under section 1983 for the actions of its employees, Huffman or Gillham.

■■ The United States Supreme Court has held that a local government is not liable under section 1983 for an injury inflicted solely by its employees or agents. *Monell v. Department of Social Services of City of New York*, 436 US 658, 694, 98 S Ct 2018, 56 L Ed 2d 611 (1978). The Court has explained that the proper focus in a section 1983 action against a municipality is on whether the policies or customs of the municipality caused the injury. *Id.* Thus, to establish properly the liability of a municipality under section 1983, a plaintiff must show the involvement of the municipality in one of the following three ways: (1) a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom that constitutes the standard operating procedure of the local governmental entity; (2) the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore*, 979 F2d 1342, 1346-47 (9th Cir 1992).

In this case, plaintiff argues that the city is liable for the actions of both Gillham and Huffman. According to plaintiff, Gillham did, in fact, have final policy-making authority as to her termination from employment. In the alternative, she argues that, even if Gillham did not have final policy-making authority, there is evidence that the city council ratified both his decision to terminate her and the basis for it. As for liability based on Huffman's actions, plaintiff argues that his "long and well-established practice of retaliating against city employees, city managers and city officers who spoke out against his interests" amounted to a *de facto* city policy.

The city argues that it cannot be held liable for the actions of either Huffman or Gillham. It asserts that it cannot be held liable for Huffman's actions because he has no final policy-making authority and because he, acting as a city councilor, has legislative immunity. It asserts that it cannot

be held liable for the actions of Gillham because he, too, has no final policy-making authority. Instead, the city argues, the municipal charter vests authority to prescribe rules for hiring and termination in the city council. As a result, the city argues, even if Gillham terminated plaintiff for an unconstitutional reason, that decision cannot fairly be ascribed to the city.

We conclude that there is conflicting evidence about the city council's involvement in the termination decision. Gillham wrote to plaintiff that he planned to speak with the city council before he decided whether to terminate her. Thereafter, Gillham had several conversations with city council members, both individually and collectively, about plaintiff. In his affidavit, Gillham stated that he did not ask the city council members what he should do about plaintiff. However, one city council member contradicted that statement in his own affidavit and stated that Gillham "informed the council of what was going on and told—and kept us well abreast of the situation, and I think he did seek counsel and that we did discuss it."

From that evidence, a factfinder could disbelieve Gillham's statement that he did not solicit advice from the city council and, instead, find that he adhered to his original plan and sought out the council's approval to terminate plaintiff. A factfinder could also infer, from the fact that Gillham actually terminated plaintiff and from the statement of at least one city council member that he approved of that decision, that Gillham received the council's approval to terminate plaintiff and that the council thereby ratified the termination. Because there are triable issues of fact on plaintiff's first claim, summary judgment was improper, and we need not address the parties' other arguments about possible bases of municipal liability.

c. Plaintiff's second claim for relief

Plaintiff's second claim for relief alleges "unlawful employment practices under [*former*] ORS 659.510(2) [and *former*] ORS 659.530." The city argues that that claim is

barred by the 90-day statute of limitation applicable under *former* ORS 659.530.[2] Plaintiff responds that the applicable statute of limitation is the one-year period prescribed by *former* ORS 659.121 (1999), *repealed by* Or Laws 2001, ch 621, § 90.[3] We agree with the city.

Plaintiff's second claim alleges a violation of *former* ORS 659.510(2), protecting whistleblowers from retaliation by their employers.[4] In 1999, there were two statutes of limitation that were potentially applicable to a claim alleging a violation of that statute depending on whether the claim was pleaded under the whistleblower statute or under the more general employment practices statute. *Olsen v. Deschutes County*, 204 Or App 7, 11-13, 127 P3d 655, *rev den*, 341 Or 80 (2006). The first type of claim is subject to the 90-day statute of limitation in *former* ORS 659.530. *Id.* The second type of claim is subject to the one-year statute of limitation in *former* ORS 659.121. *Id.* In this case, the complaint specifies that the second claim for relief is being brought under *former* ORS 659.510. Thus, the 90-day limitation of ORS 659.530 (1999) necessarily applies. We therefore agree with the city that summary judgment was proper with respect to the second claim.

---

[2] That limitation period was eliminated from the statute by the 2001 Legislative Assembly. Or Laws 2001, ch 621, § 45.

[3] *Former* ORS 659.121 provides, in part:

"(1) Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS * * * 659.035 * * * may file a civil suit in circuit court * * *.

"* * * * *

"(3) * * * [T]he civil suit or action shall be commenced within one year of the occurrence of the alleged unlawful employment practice."

[4] *Former* ORS 659.510(2) provides, in part:

"No public employer shall:

"* * * * *

"(b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;

"(B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision[.]"

### d. Plaintiff's third claim for relief

■ Plaintiff's third claim for relief is for wrongful discharge. The city argues that it was entitled to judgment as a matter of law on that claim because plaintiff was terminated pursuant to the "no cause" provision of her contract and because she accepted severance pay pursuant to that provision. Plaintiff argues that the acceptance of severance pay does not preclude a common-law action for wrongful discharge.

■ We agree with plaintiff. The tort of wrongful discharge stands as an exception to the general rule that an at-will employee can be discharged at any time for any reason. *Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 229-30, 129 P3d 213 (2006). In addition, contractual remedies do not preclude a claim for wrongful discharge. *Id.* We therefore reject the city's argument regarding the employment contract without further discussion.

### e. Plaintiff's fourth claim for relief

■ In her fourth claim for relief, plaintiff alleges that the city violated *former* ORS 659.436, by discriminating against her on the basis of a disability, that is, work-related stress. The city argues that it was entitled to summary judgment on that claim for three reasons: (1) the CDA conclusively established that plaintiff was permanently disabled before she was discharged, and the city had no obligation to reinstate a disabled worker who is unable to return to work, (2) the claim was never commenced because service of summons was improper, and (3) no reasonable juror could find that plaintiff was terminated for anything other than throwing a chair in Gillham's office. We have already addressed and rejected each of those arguments.

### f. Plaintiff's fifth claim for relief

■ In her fifth claim for relief, plaintiff alleges that the city violated *former* ORS 659.448 by unlawfully requiring her to submit to a psychological examination. The city asserts that that claim is barred by the one-year statute of limitation in *former* ORS 659.121, because plaintiff did not bring her claim within one year of the date she was asked to submit to the exam. Plaintiff responds that her action was timely

because she brought the claim within one year of the date of termination. We agree with the city.

The one-year statute of limitation begins to run when "the alleged unlawful employment practice" occurs. *Former* ORS 659.121(3). In this case, the unlawful employment practice on which plaintiff relies is the city's violation of *former* ORS 659.448, which makes it unlawful for an employer to require an employee to "submit to a medical examination." At least as to plaintiff's fifth claim, therefore, termination itself is not the unlawful employment practice; rather, it was the demand that she submit to an examination. As a result, the limitation period began to run on January 25, 2000, when the city made that demand. Because plaintiff did not bring this action until March 2001, it was untimely with respect to the fifth claim for relief, and the trial court did not err in granting summary judgment for the city on that claim.

g. Plaintiff's sixth claim for relief

Plaintiff's sixth claim for relief alleges that the city terminated her employment in violation of *former* ORS 659.410 because she had filed a workers' compensation claim. As with the fourth claim for relief, the city argues that summary judgment on the sixth claim was proper because the CDA conclusively established that plaintiff was permanently disabled, the claim was never properly commenced, and no reasonable juror could find that plaintiff was terminated for anything other than throwing a chair in Gillham's office. We have already addressed and rejected each of those arguments. Thus, we conclude without further discussion that the trial court erred in granting summary judgment on that claim.

B. *Second assignment: Dismissal of Huffman on mootness grounds*

The remaining assignment involves the question whether the trial court erred in dismissing plaintiff's section 1983 claim against Huffman on mootness grounds, based on her settlement with that defendant. Plaintiff argues that, although her settlement did dispose of the claim for intentional interference, it did not dispose of the section 1983 claim. To the contrary, plaintiff argues, the agreement itself

expressly provides that it is "not intended to release Huffman as a defendant in the lawsuit on the remaining issues or hinder his rights, duties or obligations to defend himself" on the remaining claim. The city responds that, under *Stephens v. Bohlman*, 138 Or App 381, 909 P2d 208, *rev den*, 324 Or 18 (1996), the fact that plaintiff agreed not to enforce any judgment against Huffman in excess of his insurance means that, as a matter of law, "Huffman had nothing to either gain or lose as a result of the trial."

*Stephens* was a medical malpractice case in which the representative of a deceased patient brought an action against the hospital and the treating doctor. Before trial, the plaintiff and the hospital entered into a settlement agreement. The hospital paid the plaintiff $90,000, and, in return, the plaintiff agreed not to "execute or attempt to execute on the judgment, if any, that might be entered against" the hospital, to discharge the hospital from any liability beyond $90,000, and never to sue the hospital or any of its agents or employees. The hospital also agreed to remain as a defendant in the case and to present its defenses "as if no settlement had been reached" and to make a "good faith attempt to make its employees and former employees available for testimony at trial." The defendant doctor moved for dismissal of the hospital from the case on the ground that there was no justiciable controversy between the hospital and the plaintiff. The trial court denied the motion.

We concluded that, as a result of the agreement between the parties, the hospital had literally nothing at stake in the outcome of the case:

> "Although hospital agreed nominally to remain in the case, its payment of $90,000 was absolute; nothing in the agreement entitles it to recover any portion or to pay any additional amount no matter what the outcome of the lawsuit against defendant. Thus, hospital's only purpose for appearing at the trial was to fulfill its contractual obligation to plaintiff because it had no interest in the outcome.
>
> "* * * * *
>
> "The case was moot because there was no way that the trial could have affected the rights of plaintiff and hospital between themselves. That hospital assumed a contractual

obligation to proceed as though it had not settled is irrelevant to this decision; when the parties have actually resolved a controversy, they cannot give it substance by agreeing to pretend otherwise. Although hospital apparently honored its obligation to proceed as if it were a viable party, in fact it acted a sham; a pretense of adversity, no matter how well played, does not avoid mootness."

*Id.* at 384-85.

We do not find *Stephens* to be controlling. In that case, the plaintiff specifically discharged the defendant hospital from any further liability beyond the $90,000 that the hospital had already paid. In this case, in contrast, plaintiff did not agree to discharge Huffman's liability, but rather agreed only that it would not enforce any judgment against Huffman "except to the extent that any such Judgment against Huffman may be collectible or enforceable from the City of Scappoose or any liability insurance." The agreement, in fact, specifically notes that Huffman denies liability and that the issue remains to be litigated.

It is true that the agreement effectively insulates Huffman from having personally to pay any judgment that may result from the litigation of the remaining claim against him. But the question of his liability remains an open one. Merely because a party is fully indemnified against potential liability, it does not follow that the party has nothing at stake in an action against it, nor does it render such an action moot. Indeed, if it did, anyone with sufficient liability insurance would be essentially immune from suit. The outcome of the trial will have a practical effect on Huffman's rights because it will determine whether he is personally liable. Because Huffman's personal liability to plaintiff has yet to be determined, the parties remain in an adversarial relationship and the issue is not moot. We conclude that the trial court erred in dismissing the claim as moot.

Huffman argues that, even if the trial court erred in finding plaintiff's claim moot, the error was harmless because, in any event, plaintiff failed to plead facts sufficient to state a claim under section 1983 that Huffman deprived her of her First Amendment rights. That is not an argument that Huffman made to the trial court at the hearing on the

city's motion to dismiss. (In fact, when asked by the trial court, Huffman said that he "took no position" on the city's motion to dismiss.) Huffman, however, argues that he raised the insufficiency of plaintiff's pleadings as an affirmative defense in his answer, and as part of a motion for summary judgment. The trial court denied that motion for summary judgment but Huffman does not cross-assign error to that ruling. Instead, he asks us to consider that argument now, in the interest of "judicial efficiency," as an alternative ground for affirming the dismissal of the claim against him.

We decline to do so. Although nominally presenting this argument as an "alternative grounds for affirming" the trial court's dismissal, Huffman is simply repackaging an argument that he made for summary judgment and which the trial court rejected. It is, therefore, functionally equivalent to assigning error to the denial of his summary judgment motion. To raise such a claim of error on appeal, however, a respondent must cross-assign as error any trial court ruling. ORAP 5.57; *State v. Wheelon*, 137 Or App 63, 65 n 1, 903 P2d 399 (1995), *rev den*, 327 Or 123 (1998) (party's argument that a trial court's ruling should be affirmed on grounds that the trial court rejected is properly raised by a cross-assignment of error); *see also State ex rel Osborne v. Cook*, 185 Or App 317, 325, 59 P3d 531 (2002) (an argument concerning a failure to state a claim may not be considered in the first instance on appeal). In any event, a trial court's order denying summary judgment is not reviewable unless it rests on a "purely legal contention" to which the facts of the case are "not merely undisputed but immaterial." *Seidel v. Time Ins. Co.*, 157 Or App 556, 560, 970 P2d 255 (1998). The trial court's denial of Huffman's motion for summary judgment was hardly independent of the facts; it was, rather, based on its finding that "there are genuine issues of material fact * * * that preclude granting [summary judgment.]" For all of those reasons we decline to affirm the trial court's dismissal of the claim against Huffman on the ground that it was harmless error.

Judgment on second claim against Huffman and on first, third, fourth, and sixth claims against City of Scappoose reversed and remanded; otherwise affirmed.