Argued and submitted January 24, 2012, affirmed July 17, 2013

Katie J. KEMP,
*Plaintiff-Respondent,*

*v.*

MASTERBRAND CABINETS, INC.,
a Delaware corporation,
*Defendant-Appellant,*

*and*

Linda L. DURRETT
and Clarence Beck,
*Defendants.*

Josephine County Circuit Court
05CV0589; A141576

307 P3d 491

Mark J. Romaniuk argued the cause for appellant. On the briefs was William H. Martin.

Mark Lansing argued the cause for respondent. With him on the brief were Jason S. Brouhard and Hughes, Rote, Brouhard & Thorpe, LLP.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Brewer, Judge pro tempore.*

ORTEGA, P. J.

---

* Haselton, C. J., *vice* Richardson, S. J.

## ORTEGA, P. J.

Plaintiff brought an action against her former employer, defendant MasterBrand Cabinets, Inc. ("Master-Brand"), for alleged pregnancy-based sex discrimination. She asserted two statutory claims—unlawful termination under ORS 659A.030(1)(a)[1] and retaliatory discharge under ORS 659A.030(1)(f)[2]—and a common-law claim for wrongful discharge. The two statutory claims were tried to the court, and the wrongful discharge claim was tried to the jury; plaintiff prevailed on all three claims. MasterBrand now appeals, raising four assignments of error, and plaintiff raises one cross-assignment of error. We write to address only the first three assignments of error, and reject the remaining assignment and the cross-assignment without further discussion.

We reject all three of the remaining assignments of error as well. In its first assignment of error, MasterBrand asserts that the trial court erred in denying its motion to dismiss plaintiff's wrongful discharge claim because plaintiff had adequate statutory remedies; we conclude that plaintiff's statutory remedies did not displace her common-law claim. In its second assignment of error, MasterBrand asserts that the trial court erred in granting attorney fees to plaintiff under ORS 20.107 for her wrongful discharge claim; we conclude that the fee award was not erroneous. In its third assignment of error, MasterBrand asserts that the

---

[1] As relevant here, ORS 659A.030(1)(a) provides that it is an unlawful employment practice "[f]or an employer, because of an individual's *** sex, *** to *** discharge the individual from employment."

ORS 659A.029, in turn, illuminates further what it means to discharge an employee because of her sex:

"For purposes of ORS 659A.030, the phrase 'because of sex' includes, but is not limited to, because of pregnancy, childbirth and related medical conditions or occurrences. Women affected by pregnancy, childbirth or related medical conditions or occurrences shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work by reason of physical condition, and nothing in this section shall be interpreted to permit otherwise."

[2] ORS 659A.030(1)(f) provides that it is an unlawful employment practice "[f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

trial court erred in denying its motion *in limine* regarding its later discipline and termination of an employee, Beck, who was involved in the events that led to plaintiff's termination; we conclude that any error in admitting that evidence was harmless. Accordingly, we affirm the trial court's judgment.

We begin with a review of the pertinent facts, as relevant to understand plaintiff's claims and to evaluate the court's ruling on the motion *in limine*. MasterBrand manufactures kitchen and bathroom cabinetry. Plaintiff began working for MasterBrand as a temporary employee in late 2003, and was hired as a permanent employee in May 2004. As a door puller in the warehouse on "second shift" (from 3:15 p.m. until 11:45 p.m.), plaintiff's duties included stocking, pulling, and transporting cabinet doors from the warehouse to the prep department. On Mondays through Thursdays, "third shift" followed "second shift" on each of those evenings. On Friday evenings, "second shift" was the last shift of the day, and Fridays were considered the end of a work week for "second shift" workers. The next shift to follow was a "third shift" on the following Sunday evening. Central to the parties' dispute is the significance of plaintiff's departure from work at the end of her shift on March 18, 2005.

According to MasterBrand, there was a "standing order" that on Friday evenings, "second shift" workers were often required to work overtime in order to ensure that the materials were staged for the start of production the following Sunday evening. That "Friday night rule," according to MasterBrand, was repeatedly communicated to employees at daily production meetings, and employees were required to "check in" with their team leader before leaving at the end of a Friday shift.

Plaintiff has a different view of MasterBrand's policies and procedures. MasterBrand's employee handbook does not provide a written version of the "Friday night rule." Rather, it provides generally that employees "scan out immediately after their shift ends unless authorized in advance by their Team Leader to work longer than their assigned shift for that day." The handbook also states that overtime (working over eight hours in one day) "can only be worked with

prior authorization from a Team Leader," and the handbook states that "[e]very reasonable effort will be made to give as much advance notice of overtime as possible." In cases in which an employee leaves early, the handbook provides that a deduction can be made from a "no fault" time bank, but that "no call, no show" situations result in a written warning. Further, the handbook provides that supervisors are prohibited from altering written policies.

According to plaintiff's supervisor and team leader, Durrett, on the Friday at issue, all second-shift employees were informed that they would have to work overtime that evening. However, some of the employees worked overtime and some did not, and none of them "checked in" with Durrett before leaving their shift that evening, nor did Durrett herself communicate to plaintiff that she needed to work overtime. After eight hours that evening, plaintiff, along with three or four other employees, left work at the end of the regular eight-hour shift. According to Beck, an employee who assisted Durrett, before plaintiff left that evening, Beck had reminded her about the Friday night rule and asked whether she had obtained permission from Durrett to leave after eight hours. According to Beck, plaintiff responded that she did receive permission to leave, but he later confirmed with Durrett that she had not given plaintiff such permission. Shortly thereafter, Durrett emailed human resources (HR) representatives Reed and Gatske, stating that plaintiff had not been excused from work that evening and that plaintiff left "at 8 hours." Durrett noted that three months before, plaintiff had been coached about the policy not to leave early. According to plaintiff, however, that coaching incident never occurred and, in all events, plaintiff never received a written warning about either alleged incident.

Plaintiff was terminated the following week. The company's termination report states:

"On March 18, 2005, [plaintiff] left work without asking the team leader for approval to leave. [Plaintiff] has been coached on more than one occasion regarding the need for the team to work [overtime] on Friday nights because there is not a third shift to pick up [what] is not finished. [Plaintiff] chose at the end of eight hours to clock out and leave

her job. [Plaintiff] has refused to follow her team leader's instructions. [Plaintiff's] actions on 3/18/05 violate the following [MasterBrand] policies, which state that the following actions will not be tolerated:

"1. Work rule #2:  of the Grants Pass Hourly Handbook which says, 'idleness on the job, inattention to job duties, wasting time, sleeping on the job or leaving the job without the Team Leader's approval.'

"2. Work rule #3:  Insubordination of any kind."

Plaintiff disagreed with the termination report, stating that she was fired "for being pregnant." In her view, the stated basis for her termination was pretext for the real motivation of employer, particularly Durrett, that she was pregnant and could not perform all of her regular duties. The following facts supported plaintiff's claim.

About two months before her termination, plaintiff notified MasterBrand that she was two months pregnant and submitted a doctor's note requesting a lifting restriction. The following week, plaintiff reported derogatory statements made by an employee of MasterBrand (Frye) regarding her pregnancy. Plaintiff then was moved to another working area of the warehouse to work on smaller doors while MasterBrand's HR representatives investigated the incident with Frye.

A few weeks later, on February 4, 2005, plaintiff reports that she left her regular shift 15 minutes early under Durrett's direction because all of her work had been completed. Plaintiff disagrees with Durrett's account that she was coached for that incident as an unauthorized early departure; instead, her account is that Durrett herself asked plaintiff to leave early that evening.

That same month, Beck made inappropriate statements about plaintiff's pregnancy. He told plaintiff that she "wouldn't be there much longer" and that he "didn't want to deliver no baby on the warehouse floor."

On February 23, 2005, plaintiff, along with another employee, met with Durrett to request that plaintiff work in a different area. Plaintiff had been working with a product that she did not feel comfortable with due to her pregnancy.

In response to her request to be moved, Durrett responded, "What am I supposed to do with her then?" Durrett seemed "pretty frustrated" and "upset" with plaintiff. Plaintiff apologized for "being pregnant" and, according to plaintiff, Durrett responded that she "hoped nobody else goes and gets pregnant." That day, plaintiff was moved to a different work area, the white door area.

Two days later, while plaintiff was working in the white door area, Durrett approached her and stated that plaintiff would have to get another doctor's note if she could not lift the 61-inch doors. Plaintiff had never stated that she could not lift the doors. Durrett then stated that, "if [plaintiff] couldn't do any part of [her] job," plaintiff would be "let go." In plaintiff's view, Durrett was "upset" and had a "threatening" tone of voice.

The following week, plaintiff expressed her concern about Durrett to a "first shift" supervisor, White. White informed Durrett about his conversation with plaintiff, and Durrett then reported the situation to HR representative Gatske by email. Gatske met with plaintiff and told her that it was "inappropriate" for her to express her concerns to White. Gatske also told her that, if she used the word "harassment," Gatske would do an investigation about the allegations and "[plaintiff] would be the one in trouble."

The next day, plaintiff, along with her husband, informed MasterBrand's chief executive, Loftesness, about the incidents that had taken place and plaintiff's concern about her job security. Shortly thereafter, on March 1, 2005, Loftesness called a meeting with some of the HR representatives, Durrett, and plaintiff. Durrett repeatedly denied making any discriminatory statements to plaintiff, and plaintiff sensed that everyone at the meeting was "taking [Durrett's] side." Plaintiff's termination occurred three weeks later.

Plaintiff's subsequent complaint was based on allegations that she was subjected to unlawful discrimination on the basis of sex because of her pregnancy under ORS 659A.030(1)(a), that she was discharged in retaliation for asserting her right to be free of discrimination based on sex because of her pregnancy under ORS 659A.030(1)(f),

and that she was wrongfully discharged on the basis of sex because of her pregnancy. The judge ruled in plaintiff's favor on the statutory claims, and the jury found in her favor on the common-law wrongful discharge claim. MasterBrand appeals.

In its first assignment of error, MasterBrand asserts that plaintiff's common law wrongful discharge claim should have been dismissed because plaintiff had adequate state and federal statutory remedies, under ORS chapter 659A and Title VII of the Civil Rights Act of 1964, respectively. MasterBrand hearkens to the well-settled principle that wrongful discharge constitutes an "interstitial tort, designed to fill a gap where a discharge in violation of public policy would otherwise not be adequately remedied." *Dunwoody v. Handskill Corp.*, 185 Or App 605, 613, 60 P3d 1135 (2003).

In the context of a common-law claim for wrongful discharge, the "adequacy" of statutory remedies informs two inquiries. On the one hand, Oregon courts will not, in the first instance, extend the common-law remedy to cover a situation where existing statutory remedies "are adequate to protect both the interests of society * * * and the interests of employees * * *." *Walsh v. Consolidated Freightways*, 278 Or 347, 352, 563 P2d 1205 (1977). If, on the other hand, the common-law claim *preexisted* the statutory remedies in question, the "adequacy" of that subsequently provided remedy is only part of the inquiry. In that circumstance, the defendant "must demonstrate both that the remedy * * * is adequate in comparison to the remedy available under a common-law tort action *and also that the legislature intended the statute to abrogate the common law.*" *Olsen v. Deschutes County*, 204 Or App 7, 14, 127 P3d 655, *rev den*, 341 Or 80 (2006) (emphasis added). *See Brown v. Transcon Lines*, 284 Or 597, 602, 588 P2d 1087 (1978) (explaining that, if "[the] plaintiff had a cause of action for damages for wrongful discharge based upon previously existing principles of common law, then the primary focus of the problem is not so much whether 'adequate' administrative remedies were provided by ORS [chapter] 659 at the time of [the] plaintiff's discharge, but whether by the enactment of that statute the Oregon legislature abolished a previously existing common law cause of

action"); *Farrimond v. Louisiana-Pacific Corp*, 103 Or App 563, 567, 798 P2d 697 (1990) ("Although the statute does not expressly state that it is intended to supersede the common law remedy, the legislature's adoption of virtually all remedies that would have been available at common law lead us to conclude that it intended the statutory remedy to be exclusive.").[3]

In this case, a common-law claim for wrongful discharge for discrimination based on sex preexisted the statutory remedies that MasterBrand claims now provide plaintiff with an adequate remedy. *See, e.g., Holien v. Sears, Roebuck and Co.*, 298 Or 76, 689 P2d 1292 (1984) (the plaintiff had a common-law cause of action for resisting conduct that would amount to discrimination on the basis of sex under Title VII). Accordingly, for those subsequently enacted statutes to displace that preexisting common-law claim, they must not only have provided "adequate" remedies but also have been intended to displace the claim. Here, we conclude that the statutes were neither.

As to plaintiff's state statutory remedies, Master-Brand contends that plaintiff's claims under ORS 659A.030 offered adequate remedies because that statute provides both equitable relief, such as reinstatement, back pay, injunctions, and costs and attorney fees,[4] as well as legal remedies, such as compensatory and punitive damages, as provided

---

[3] We have often conflated our discussion of the "adequacy" of statutory remedies for purposes of "extending" a tort claim and "abrogating" a previously extended tort claim. We appreciate, as well, that the role of an "adequate" remedy is not free from doubt in Oregon case law, particularly in light of *Walsh*. However, we understand *Walsh* to involve a situation in which, because of the timing of the discharge in that case (i.e., before the court first recognized the tort of wrongful discharge in *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975)), there was no preexisting tort claim.

[4] ORS 659A.885(1) provides:

"Any person claiming to be aggrieved by an unlawful practice specified in subsection (2) of this section may file a civil action in circuit court. In any action under this subsection, the court may order injunctive relief and any other equitable relief that may be appropriate, including but not limited to reinstatement or the hiring of employees with or without back pay. A court may order back pay in an action under this subsection only for the two-year period immediately preceding the filing of a complaint under ORS 659A.820 with the Commissioner of the Bureau of Labor and Industries, or if a complaint was not filed before the action was commenced, the two-year period immediately preceding the filing of the action. * * *."

by ORS 659A.885(3).[5] However, as plaintiff correctly points out, the legal remedies presently available under ORS 659A.885(3) for claims brought under ORS 659A.030 were not available at the time of the alleged incidents.[6] Accordingly, plaintiff argues that the state statutory remedies were not adequate and therefore did not preclude her from bringing a common-law claim of wrongful discharge. *See Reddy v. Cascade General, Inc.*, 227 Or App 559, 571, 206 P3d 1070 (2009) (in determining whether, "under Oregon law, an available statutory remedy is deemed 'adequate' so as to displace a plaintiff's common-law wrongful discharge claim," we evaluate whether "the statute provides for such '[l]egal as well as equitable remedies [as] are needed to make the plaintiff whole,' including damages that will 'compensat[e] the plaintiff for such personal injuries as anguish, physical symptoms of stress, a sense of degradation, and the cost of psychiatric care'" (brackets in *Reddy*) (quoting *Holien*, 298 Or at 97)).

We agree with plaintiff that, at the time of the incident, she did not have adequate state statutory remedies. As the Supreme Court explained in *Holien*, "Legal as well as equitable remedies are needed to make the plaintiff whole." 298 Or at 97. Here, because plaintiff's state statutory remedies were limited to reinstatement, back pay, injunctions, and costs and attorney fees, and legal remedies were not available to a party making a claim under ORS 659A.030,[7] plaintiff's state statutory remedies failed to meet the standard of adequacy set forth in *Holien*. Accordingly, plaintiff's state statutory remedies did not displace her common-law wrongful discharge claim.

---

ORS 659A.885(2), in turn, provides, in pertinent part, that "[a]n action may be brought under subsection (1) of this section alleging a violation of ORS *** 659A.030 ***."

[5] ORS 659A.885(3) provides:

"In any action under subsection (1) of this section alleging a violation of ORS *** 659A.030 ***[,] *** [t]he court may award, in addition to the relief authorized under subsection (1) of this section, compensatory damages or $200, whichever is greater, and punitive damages; *** [a]t the request of any party, the action shall be tried to a jury[.]"

[6] In 2007, ORS 659A.885(3) was amended to include claims brought under ORS 659A.030. Or Laws 2007, ch 280, § 1. That amendment, however, applies to acts committed on or after the effective date of the act, January 1, 2008. *Id.* § 2.

[7] *See former* ORS 659A.885 (2005).

Nor do plaintiff's federal remedies displace her common-law wrongful discharge claim. MasterBrand asserts that, although plaintiff did not pursue federal remedies, she could have obtained adequate remedies under Title VII and, accordingly, was precluded from bringing a common-law wrongful discharge claim. We disagree.

The pertinent subsections of Title VII, as amended, provide:

> "It shall be an unlawful employment practice for an employer * * * to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex[.]"

42 USC § 2000e-2(a)(1); *see also id.* § 1981a(a)(1) (providing compensatory and punitive damages for actions brought under § 2000e-2); 42 USC § 2000e-5(g)(1) (providing equitable damages for actions brought under 42 USC § 2000e-2). In MasterBrand's view, after the 1991 amendments to Title VII, both compensatory and punitive damages were available and, therefore, no common-law wrongful discharge claim is needed to fill a remedial gap. Plaintiff, however, notes that compensatory and punitive damages are capped under Title VII and that, therefore, the federal remedies are inadequate.

Assuming, without deciding, that plaintiff had adequate federal remedies available to her under Title VII, Congress expressed its intention that Title VII remedies *not* displace a common law remedy. 42 USC section 2000e-7 provides:

> "Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."

42 USC § 2000e-7. To hold that Title VII displaces plaintiff's common-law remedy would be incongruous with that expressed intention. Accordingly, the trial court did not err

in denying MasterBrand's motion to dismiss plaintiff's common-law wrongful discharge claim.

In its second assignment of error, MasterBrand contends that the trial court erred in granting attorney fees to plaintiff under ORS 20.107 for her wrongful discharge claim. Specifically, MasterBrand asserts that ORS 20.107 "only provides for attorney fees in connection with a statutory discrimination claim" and that "Oregon courts have consistently held that a plaintiff is not entitled to attorney fees pursuant to ORS 20.107 on a wrongful discharge claim." We disagree.

ORS 20.107 provides:

"(1) In any civil judicial proceeding, including judicial review of an administrative proceeding based on a claim of 'unlawful discrimination,' the court shall award to the prevailing plaintiff attorney * * * fees reasonably and necessarily incurred in connection with the discrimination claim, at the trial court or agency level and on appeal. * * *

"* * * * *

"(4) As used in this section, 'unlawful discrimination' means discrimination based upon personal characteristics including, but not limited to * * * sex * * *."

Nothing in that language limits attorney fees to *statutory* discrimination claims; rather, the statute simply provides that it applies in any civil judicial proceedings "based on" or "in connection with" a claim of unlawful discrimination. Moreover, as plaintiff points out, statutory discrimination claims include their own separate provisions for the recovery of attorney fees. *See, e.g.*, ORS 659A.885. Had the legislature intended for ORS 20.107 to be limited to statutory claims, it could easily have provided for such a limitation.

Contrary to MasterBrand's contention, *Mantia v. Hanson*, 190 Or App 36, 43 n 5, 77 P3d 1143 (2003), is not to the contrary. There we noted,

"Because 'unlawful discrimination' is statutorily defined as 'discrimination based upon *personal characteristics*,' ORS 20.107(4), that statute would not apply to the circumstances alleged in [the] plaintiff's retaliatory discharge claim."

(Emphasis added.) MasterBrand asserts that *Mantia* draws a distinction between retaliation claims and discrimination claims and that plaintiff's is a claim for retaliatory discharge. However, the plaintiff's retaliatory discharge claim in *Mantia* was based on allegations that he was discharged for complaining about unsafe working conditions, rather than discrimination based on "personal characteristics." Here, by contrast, plaintiff's wrongful discharge claim was necessarily made "in connection with" a claim of unlawful discrimination "based on personal characteristics including * * * sex" as described in ORS 20.107. Accordingly, the trial court did not err in granting attorney fees to plaintiff for her wrongful discharge claim.

Finally, in its third assignment of error, Master-Brand argues that the trial court erred in denying its motion *in limine* to exclude evidence that, about 18 months after plaintiff was terminated, Beck was disciplined and ultimately terminated for making discriminatory and offensive statements to, and having inappropriate physical contact with, female employees other than plaintiff. MasterBrand argued that the evidence was not relevant and was highly prejudicial. Plaintiff responded that the evidence was relevant to "motive intent, plan, bias, and background evidence" and was not unduly prejudicial.

Assuming without deciding that the evidence of Beck's later discipline and termination was erroneously admitted, we conclude that any error was harmless. Evidentiary error is not presumed to be prejudicial. OEC 103(1). Accordingly, we will affirm a judgment despite evidentiary error if there is "little likelihood that the particular error affected the verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Beck's involvement in plaintiff's case involved comments that plaintiff asserts he made to her related to her pregnancy and his alleged communications with her and with Durrett on the Friday night when MasterBrand contends that plaintiff improperly left work. Neither Beck's motives nor his role in supporting Durrett's actions with regard to plaintiff were central to plaintiff's case, nor were his motives and actions essential to MasterBrand's defense. As plaintiff contends, there was ample independent evidence that "discriminatory animus came from Durrett and [HR],"

and MasterBrand contends that Beck was not a supervisor and played little role in its actions toward plaintiff. Moreover, MasterBrand argued at trial that, because plaintiff's scan card would have immediately shown when plaintiff left work on the Friday evening at issue, Beck's report to Durrett of her departure was not essential to her termination.

Further, despite MasterBrand's assertion that the evidence at issue tainted Beck's credibility so that it could not call him as a witness, MasterBrand was able to present evidence of Beck's participation through exhibits and through Durrett's testimony. In all events, MasterBrand noted in closing arguments that,

> "[a]t some point you've got to decide the jury has heard enough, and I think that's what both parties decided, so neither party called * * * Beck, because really his role was minimal. It was important, but it was minimal."

As MasterBrand acknowledged, then, Beck's role was not central to its case. Indeed, the fact that Beck was later terminated once MasterBrand learned of his conduct toward other women arguably cuts in MasterBrand's favor, because it undercuts plaintiff's argument that he conspired with Durrett to discriminate against plaintiff. Further, MasterBrand has not adequately explained nor does our review of the record suggest how the use of the challenged evidence at trial created the kind of prejudice that might have affected the verdict. On this record, we conclude that there is little likelihood that the admission of evidence relating to Beck's discipline and subsequent termination affected the verdict.

Affirmed.